**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MEDINATURA, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 1:20-cv-02066-RDM |
| FOOD AND DRUG ADMINISTRATION, *et al.*, | |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**
**<u>OR, IN THE ALTERNATIVE, TEMPORARY RESTRAINING ORDER</u>**

MORGAN, LEWIS & BOCKIUS LLP

Jason R. Scherr, Bar No. 466645
David B. Salmons
jr.scherr@morganlewis.com
david.salmons@morganlewis.com
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Tel.    202.739.3000
Fax    202.739.3001

Attorneys for Plaintiff MediNatura

i

## **TABLE OF CONTENTS**

I. INTRODUCTION .................................................................................................... 2

II. STATEMENT OF FACTS ..................................................................................... 8

  A. FDA's Regulation of Homeopathic Products ................................................ 8

    1. The FFDCA treats homeopathic products as a unique category of drugs ................ 8

    2. For over 30 years, FDA allowed and regulated the sale of homeopathic drugs
    under CPG 400.400 ................................................................................ 10

    3. FDA recently departed dramatically from its longstanding policy regarding
    homeopathic drugs ................................................................................ 10

  B. FDA's Actions Regarding MediNatura's Products ....................................... 12

    1. MediNatura produces prescription homeopathic treatments that are a safe
    alternative to allopathic drugs ................................................................. 12

    2. MediNatura and the entire homeopathic drug industry, medical
    practitioners, and patients have relied on FDA's regulatory scheme under CPG
    400.400 ................................................................................................ 14

    3. FDA's Import Alert suddenly banned import of all of MediNatura's
    prescription homeopathic injectable products. ........................................... 15

    4. Contrary to FDA's claims, MediNatura's prescription homeopathic
    injectable products are safe and thoroughly regulated ............................... 16

    5. The Import Alert is catastrophic to MediNatura's business .................... 21

    6. The Import Alert is detrimental to the medical practitioners and patients
    who rely on MediNatura's products ......................................................... 21

III. ARGUMENT ...................................................................................................... 23

  A. MediNatura Is Likely to Succeed on the Merits of its Claims ................... 23

    1. *MediNatura is likely to succeed on its claim that FDA departed from its
    previous regulatory regime without sufficient consideration of reliance interests* ......... 23

    2. *MediNatura is likely to succeed on its claim that FDA's Import Alert did not
    comply with the rulemaking procedures of the APA* ..................................... 28

    3. *MediNatura is likely to prevail on its claim that FDA's assessment of the safety
    of MediNatura's products was arbitrary and capricious* ................................ 32

**4.** *MediNatura is likely to succeed on its claim that FDA has arbitrarily failed to consider whether homeopathic drugs are GRAS&E or create an appropriate NDA process for homeopathic drugs* ........................................................................................ 35

**B. MediNatura Will Suffer Irreparable Harm Absent an Injunction** ............................. 40

**C. Neither Defendants Nor the Public Interest Would Be Harmed By an Injunction** ................................................................................................................ 42

**IV. CONCLUSION** ........................................................................................................ 44

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Bellarno Int'l Ltd. v. Food & Drug Admin.*,
    678 F. Supp. 410 (E.D.N.Y. 1988) ...................................................................30

*Omnipoint Corp. v. F.C.C.*,
    78 F.3d 620 (D.C. Cir. 1996) ..........................................................................31

*Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*,
    317 F. Supp. 3d 555, 563 (D.D.C. 2018) .....................................................40, 41

*Clarke v. Office of Fed. Hous. Enter. Oversight*,
    355 F. Supp. 2d 56 (D.D.C. 2004) ..............................................................40, 41

*Estate of Coll-Monge v. Inner Peace Movement*,
    524 F.3d 1341 (D.C. Cir. 2008) .......................................................................23

*Davenport v. Int'l Bhd. of Teamsters, AFL-CIO*,
    166 F.3d 356 (D.C. Cir. 1999) .........................................................................23

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
    140 S. Ct. 1891 (2020).............................................................................. *passim*

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016).............................................................................23, 28

*F.C.C. v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)......................................................................................24

*Guedes v. Bureau of Alcohol, Tobacco, Firearms and Explosives*,
    920 F.3d 1 (D.C. Cir. 2019) ............................................................................29

*Motor Vehicle Mfrs. Ass'n. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)................................................................................31, 32, 33

*Nat'l Min. Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014) .........................................................................29

*Nken v. Holder*,
    556 U.S. 418 (2009)...................................................................................23, 42

*Rapanos v. United States*,
    547 U.S. 715 (2006) (Scalia, J., concurring) .....................................................39

*Sec. Indus. & Fin. Markets Association v. U.S. Commodity Futures Trading Comm'n*,
   67 F. Supp. 3d 373, 416 (D.D.C. 2014) ....................................................................29

*Smoking Everywhere, Inc. v. U.S. Food & Drug Admin.*,
   680 F. Supp. 2d 62 (D.D.C. 2010) ....................................................................40, 41

*Syncor Intern. Corp. v. Shalala*,
   127 F.3d 90 (D.C. Cir. 1997) ..................................................................................29

*Tom Doherty Assocs., Inc. v. Saban Entm't Inc.*,
   60 F.3d 27 (2d. Cir. 1995) ......................................................................................41

**Statutes**

5 U.S.C. § 553 .....................................................................................................28, 29, 31

5 U.S.C. § 706 ........................................................................................4, 28, 29, 30, 33

21 U.S.C. § 321(g)(1) ..............................................................................9, 33, 37, 39

21 U.S.C. § 321(p)(1) ..............................................................................8, 35, 37, 40

21 U.S.C. § 352(e)(3) ..............................................................................................10

21 U.S.C. § 353(b) ...................................................................................................20

21 U.S.C. § 355 ..........................................................................................................8

21 U.S.C. § 355(a) ...................................................................................................35

21 U.S.C. § 360eee(13) ........................................................................................6, 9

21 U.S.C. § 503A(a) ...........................................................................................22, 43

CARES Act, Pub. L. No. 116-136 (2020) ..........................................................8, 9, 38

**Regulations**

37 Fed. Reg. 9464 (May 11, 1972) ..........................................................2, 9, 37, 38

84 Fed. Reg. 57439 (Oct. 25, 2019) ......................................................................11

**Other Authorities**

Comments of The Senior Citizens League, dated Mar. 20, 2018, *available at*
   https://www.regulations.gov/document?D=FDA-2017-D-6580- ..............................7

Comments of the National Health Freedom Action, March 8, 2018, *available at* https://www.regulations.gov/document?D=FDA-2017-D-6580-2276; Comments ........................................................................................................................11

Comments of the Consumer Healthcare Products Association, May 14, 2018, *available at* https://www.regulations.gov/document?D=FDA-2017-D-6580-4611................................................................................................................11, 43

Comments of the Homoeopathic Pharmacopoeia Convention of the United States ("HPCUS"), May 14, 2018, at 3*, available at* https://www.regulations.gov/document?D=FDA-2017-D-6580-4766; Comments ........................................................................................................................11

Comments of the American Association of Homeopathic Pharmacists ("AAHP"), May 18, 2018, at 1, *available at* https://www.regulations.gov/document?D=FDA-2017-D-6580-4647 ............................11, 43

Comments of the American Association of Homeopathic Pharmacists ("AAHP") May 19, 2020, at 1–5, 11, *available at* https://www.regulations.gov/document?D=FDA-2017-D-6580-32463; Comments ........................................................................................................................11

Comments of the Homoeopathic Pharmacopoeia Convention of the United States, May 19, 2020, at 2, *available at* https://www.regulations.gov/document?D=FDA-2017-D-6580-32710 ................................11

Clarke Dictionary of Practical Materia Medica ........................................................................18

Dossett, M. et al., *Homeopathy Use by US Adults: Results of a National Survey,* AMERICAN J PUBLIC HEALTH, 2016; 106: 743–45 ....................................................2, 14

Dossett, M. and Yeh G., *Homeopathy Use in the USA and Implications for Public Health: a Review*........................................................................................................2, 14

Exec. Order No. 13,891, 84 Fed. Reg. 55,235 (Oct. 9, 2019) ......................................................31

FDA, *Adverse Event Reporting System (FAERS) Public Dashboard*, *available at* https://www.fda.gov/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-public-dashboard ........................................................................................................................16

FDA, *Compounding Law and Policies*, *available at* https://www.fda.gov/drugs/human-drug-compounding/compounding-laws-and-policies..............................................................................................................22, 43

FDA, *FDA Warns Four Manufacturers of Unapproved Injectable Drugs Labeled as Homeopathic* June 16, 2020, *available at* https://www.fda.gov/news-events/press-announcements/fda-warns-four-manufacturers-unapproved-injectable-drugs-labeled-homeopathic ..............................................................................21, 22

FDA, *Regulation Overview: GRASE*, *available at* https://www.accessdata.fda.gov/scripts/cder/training/OTC/topic3/topic3/da_0 1_03_0040.htm ...............................................................................................36

FDA, *Thimerosal and Vaccines* (Feb. 1, 2018), *available at* https://www.fda.gov/vaccines-blood-biologics/safety-availability-biologics/thimerosal-and-vaccines.....................................................................19, 34

MediNatura, *Frequently Asked Questions*, *available at* https://medinatura.com/faqs/..........................................................................13

National Institutes Of Health, *Homeopathy*, *available at* https://www.nccih.nih.gov/health/homeopathy (the NIH estimates that five million adults and one million children used homeopathy in 2011)...................................2, 14

In addition to a wide range of over-the-counter ("OTC") homeopathic drug products, MediNatura distributes six non-steroidal, non-opioid, prescription injectable drugs.  *See* exhibit F – Cliff Clive Affidavit, at ¶ 6.[1]  For nearly two decades, doctors have safely prescribed the six Products for their patients, administered under their direct medical supervision primarily for the treatment of pain management symptoms.[2]  *Id.*  Because they are homeopathic rather than allopathic,[3] the ingredients in the Products are monographed in the official Homœopathic Pharmacopœia of the United States ("HPUS") rather than the United States Pharmacopeia ("USP") and have been regulated by FDA under a separate but parallel regime to USP-listed drug products such as corticosteroids and opioids.  *Id.* at ¶10.  In a sweeping action lacking any individualized consideration of the Products' superior safety relative to prescription alternatives, Defendants have acted to summarily remove the Products from the market entirely, thereby causing irreparable harm to MediNatura, depriving doctors the benefit of their medical judgments developed over decades of experience, and depriving patients the medical treatments on which they have come to rely.  This Court should restore the status quo ante during the pendency of this action, so that doctors may continue to prescribe and patients may continue to use the Products until such time as Defendants lawfully establish a basis to deny them that right.

---

[1] All references to lettered exhibits are to the individual exhibits attached to the accompanying Declaration of Jason R. Scherr, filed herewith.

[2] The only drug of the six not prescribed explicitly for pain management is *Engystol*, which is prescribed as an immunity booster to help reduce the severity and duration of symptoms in viral infections—which may include pain—particularly in the early stages of colds and influenza-like illnesses.  *See* exhibit F – Cliff Clive Affidavit, at ¶ 6.

[3] An allopathic drug product is one that is non-homeopathic.

I.  **INTRODUCTION**

Since the passage of the FFDCA in 1938, homeopathic drugs have been recognized as well established but distinct from traditional allopathic drugs.  Consistent with the unique nature of homeopathic medicine, FDA has excluded homeopathic drugs from its standard process for reviewing OTC drugs that began in 1972.  *See* 37 Fed. Reg. 9464 at 9466 (May 11, 1972) ("Because of the uniqueness of homeopathic medicine, the Commissioner has decided to exclude homeopathic drugs from the OTC drug review and to review them as a separate category at a later time after the OTC drug review was complete.").  And in 1988, FDA published guidance that laid out requirements specific to manufacturing, marketing, and labeling homeopathic drugs for sale in the United States—including drugs like the Products, which are available only by prescription from doctors and other medical professionals licensed in each state to prescribe drugs.[4]  *See* exhibit A – CPG 400.400.

Homeopathic drug manufacturers, practitioners, and patients have relied on the regulatory scheme of FDA's 1972 exemption and 1988 guidance ever since.  Along the way, more than six million patients and consumers per year in the United States have sought or received the benefit of homeopathic treatment.[5]  MediNatura has expanded its product lines to provide millions of doses of injectable homeopathic medicines, as well as OTC products.  *See* exhibit F – Cliff Clive

---

[4] In the District of Columbia, for example, nurse practitioners in addition to medical doctors are licensed to prescribe drugs such as the Products.  *See* District of Columbia Mun. Regs. § 17-5909

[5] NATIONAL INSTITUTES OF HEALTH, *Homeopathy*, *available at* https://www.nccih.nih.gov/health/homeopathy (the NIH estimates that five million adults and one million children used homeopathy in 2011); *see also* Dossett, M. et al., *Homeopathy Use by US Adults: Results of a National Survey*, AMERICAN J PUBLIC HEALTH, 2016; 106: 743–45, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4816083/; Dossett, M. and Yeh G., *Homeopathy Use in the USA and Implications for Public Health: a Review*. HOMEOPATHY. 2018; 107(1): 3–9, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5989719/ (both articles note that just over 2% of U.S. adults use homeopathy).

Affidavit, at ¶ 16.  MediNatura's homeopathic drugs have provided important alternatives from which licensed medical professionals throughout the United States may choose to manage the pain and other symptoms of patients without the risk of comparable allopathic treatments.  *Id.* Indeed, MediNatura's injectable drugs have been dramatically safer than the most common alternative, corticosteroids.  Although more than 86,000 serious adverse drug reactions ("ADR") reports for corticosteroids have been filed in the United States over the past 18 years, the number of serious ADR reports for any of MediNatura's injectable products in the United States over the same time period is *one*.  *See* exhibits N – FAERS ADR Data for Corticosteroids; L – U.S. Safety Data for MediNatura Injectables.

Doctors' and patients' ability to rely on this regulatory scheme was halted in October 2019, when FDA unexpectedly withdrew its 1988 guidance.  Along with that withdrawal, FDA issued a revised set of Draft Guidance that, if finalized, would not only subject homeopathic drugs to the regulatory regime developed for allopathic drugs—the class of drugs from which homeopathic drugs were explicitly distinguished by statute—but also would hold homeopathic drugs to such allopathic requirements without affording them the nearly half-century available to manufacturers of allopathic drugs to develop and implement the processes necessary to come into compliance.  *See* exhibit C – 2019 Draft Guidance.  Under the 2019 Draft Guidance, homeopathic drugs would be treated as "new drugs" regardless of how long or how safely they have been used and would be required to complete an extensive New Drug Application ("NDA") before they could resume being sold in the United States.  *Id.* at 4–5.  The guidance also presumes that certain categories of homeopathic drugs, including injectable drugs, are particularly dangerous.  *Id.*

FDA did not even wait to finalize that guidance before acting to enforce it.  In June 2020, it included, alongside other homeopathic injectable drugs, the six MediNatura prescription homeopathic injectable products (the "Products") in Import Alert 66-41, directing the United States Customs and Border Protection ("USCBP") and FDA field offices to detain shipments of these homeopathic drugs.  *See* exhibit J – Import Alert, at 112.  The Import Alert was not subject to any notice-and-comment process and did not provide any explanation of why MediNatura's drugs were to be detained, other than a general statement that "unapproved" drugs could be unsafe.  *Id.* at 1.  FDA also issued a separate Warning Letter to MediNatura, instructing MediNatura to stop selling its prescription homeopathic injectable products without an NDA.  *See* exhibit I – FDA Warning Letter.  The Warning Letter claimed that these products were potentially dangerous because they were injectable and because they contained substances that can be toxic in high quantities, although FDA does not contend that the Products contain high quantities of such substances.  *Id.* at 1.

  FDA's sudden withdrawal of its long-standing guidance and its unexplained Import Alert suffer from serious flaws under the Administrative Procedure Act ("APA") and are inconsistent with the FFDCA.

  *First*, FDA's withdrawal of CPG 400.400 and the Import Alert both entirely fail to consider the reliance interests of the homeopathic drug industry, medical practitioners, and patients—all of whom were upended by FDA's dramatic change in policy.  Not only did FDA neglect to weigh those reliance interests or consider ways to accommodate them, it did not even acknowledge that they exist.  In its most recent discussion of the question, the United States Supreme Court unambiguously reaffirmed in *Dep't of Homeland Sec. v. Regents of the Univ. of*

*California*, 140 S. Ct. 1891, 1895 (2020), that FDA's failure to consider and carefully weigh reliance interests, standing alone, renders the Agency's actions unlawful.

*Second*, the Import Alert places binding, prospective requirements on a group of distributors and importers of homeopathic drugs, despite the fact that it was not promulgated through notice-and-comment rulemaking.  In fact, none of FDA's withdrawal of CPG 400.400, 2019 Draft Guidance, Warning Letter, or Import Alert has been through a completed notice-and-comment process.  Given the sweeping, categorical nature of FDA's actions and the significant reliance interests at issue, the Agency's failure to follow notice-and-comment procedures also dooms FDA's actions.

*Third*, the Import Alert is arbitrary and capricious because it provides no reasoned explanation for detaining the Products—which have a long and proven record of safety.  And the rationales provided in the separate Warning Letter are arbitrary in several ways—specifically, FDA: (1) failed to consider that concentrations of the potentially toxic substances it identified in the Products are far below toxic levels and far lower than concentrations that FDA regards as "safe" in other injectable products;[6] (2) determined that the Products were inherently dangerous without examining the decades of safety data regarding these injectable products;[7] and (3) failed

---

[6] For instance, the maximum content of "mercurius solubilis" in each ampoule of *Traumeel* is 0.00099 μg, which is well below  the calculated Permitted Daily Exposure of mercury or 3 μg per day for a 50-kg adult.  *See* exhibit U – Non-clinical Safety Assessment of Mercurius Solubilis, at 4.  Similarly, the maximum content of "embryo suis" found in each ampoule of *Zeel* is 0.002 μg, well below the most restrictive Threshold of Toxicological Concern for this substance, which is set at 0.15 μg per day.  *See* exhibit Y – Non-clinical Safety Assessment of Embryo Suis, at 3.

[7] For instance, pre-clinical and clinical safety data for the Products show good tolerability and a low number of non-serious side effects following parenteral administration.  *See* exhibits O – *Zeel* Study Data, at 11; P – *Traumeel* Study Data, at 11; Q – *Engystol* Study Data, at 10; R – *Neuralgo Rheum* Study Data, at 5; S – *Lymphomyosot X* Study Data, at 6; T – *Spascupreel* Study Data, at 6.

to consider that the Products are manufactured according to rigorous manufacturing requirements that FDA itself has inspected[8] and that they are available only through prescription and under the supervision of licensed medical practitioners exercising their professional judgment.[9]

*Fourth*, FDA's actions are arbitrary and inconsistent with the FFDCA because they together leave no realistic pathway for the marketing of homeopathic drugs.  Without CPG 400.400, homeopathic drugs would need to either go through an NDA process that is cost-prohibitive and does not account for homeopathic evidence or have FDA complete a GRAS&E determination that it has never even analyzed for a homeopathic product.  Yet, FDA did not consider creating an NDA process or a pathway for GRAS&E determinations that is appropriate for homeopathic drugs.  The result of those failures is that the Products cannot, as a practical matter, be marketed in the United States.  Although decades of research and practitioner experience demonstrate that the Products are GRAS&E, FDA did not consider that evidence or even create a process that would enable it to consider that evidence.  FDA's failures are contrary to Congress's repeated recognition that homeopathic drugs are unique and should be regulated differently from allopathic drugs.[10]

Without a preliminary injunction, FDA's withdrawal of CPG 400.400 and issuance of the Import Alert will have significant irreparable consequences for MediNatura.  MediNatura has only a few weeks' supply of four of the Products and until October for the other two, so the

---

[8] *See* exhibit F – Cliff Clive Affidavit, at ¶¶ 9, 14; *see also* exhibits DD – FDA Inspection Classification Results for MediNatura and Heel; H – FDA inspection letter for the Siegfried facility.

[9] *See* exhibit F – Cliff Clive Affidavit, at ¶¶ 6–7.

[10] *See, e.g.*, 21 U.S.C. § 360eee(13) ("The term 'product' means a prescription drug in a finished dosage form for administration to a patient without substantial further manufacturing […] but for purposes of section 360eee–1 of this title, does not include […] homeopathic drugs marketed in accordance with applicable guidance under this chapter[.]").

Import Alert will soon cause MediNatura to be unable to supply those products at all.  *See* exhibit F – Cliff Clive Affidavit, at ¶ 24.  Because the Products make up just over 40% of MediNatura's business, that loss of revenue will threaten MediNatura's viability.  *Id.* at ¶¶ 8, 24. And even if MediNatura is able to remain afloat, it will never be able to recover its losses because it cannot sue FDA for money damages.  The Import Alert also will interfere with MediNatura's fundamental mission of providing safe homeopathic remedies as an alternative to riskier treatments like corticosteroids or opioids.

If not enjoined, these regulatory actions will also be deleterious to the public interest. When the supply of the Products soon runs out, licensed medical professionals and the patients they currently treat with these products will be forced to consider riskier treatments for managing those patients' symptoms.  *See id.* at ¶¶ 16, 25.  That outcome would be particularly problematic because treatments like steroids are contraindicated for many patients with conditions including heart disease or diabetes.  *Id.* at ¶ 16.  Practitioners may be put in the position of deciding whether to leave their patients in pain, prescribe contraindicated allopathic treatments, or turn to individually compounded homeopathic treatments that are not produced according to FDA's manufacturing standards.  *Id.* at ¶ 25.  And vulnerable groups like seniors who rely on MediNatura's products for pain management are likely to be particularly affected by the lack of a safe alternative to steroids or opioids.[11]

On the other side of the equation, there is no important public interest weighing in favor of including the Products in the Import Alert.  Given the well established safety record of the Products and the long history of their being lawfully available and commonly used in the United

---

[11] *See* Comments of The Senior Citizens League, dated Mar. 20, 2018, *available at* https://www.regulations.gov/document?D=FDA-2017-D-6580-4169.

States, there is no danger in allowing them to continue to be supplied through the same channels to the same doctors as they have been for nearly two decades. That is true, moreover, even if FDA is considering changing the regulatory approval process for these products. The strong reliance interests, which FDA has completely and unlawfully disregarded, should require the Agency, at a minimum, to continue to permit importation until the regulated entities have an opportunity to adjust to and comply with the new regime. Although it is not clear today what such a regime ultimately might look like, if one is developed, one thing is certain: FDA's sudden policy flip-flop and ban on importation of products that are proven safe and widely relied upon by medical professionals and patients is arbitrary and capricious and contrary to law. That ban should be enjoined to avoid the irreparable harm to MediNatura and to the public interest.

## II.     STATEMENT OF FACTS

### A.  FDA's Regulation of Homeopathic Products

#### 1.  The FFDCA treats homeopathic products as a unique category of drugs.

The FFDCA proscribes the introduction into interstate commerce of any "new drug" without an approved NDA. 21 U.S.C. § 355. Drugs are excluded from the definition of "new drugs" under the FFDCA if they are "generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested" in the respective labeling for each such product. 21 U.S.C. § 321(p)(1). Such drugs commonly are referred to as "GRAS&E." Most OTC drugs that are not homeopathic have been determined to be GRAS&E through FDA's OTC Drug Review process, which began in 1972 and recently was largely concluded through legislative provisions within the CARES Act. H.R. 748 §§ 3851–3862.

FDA, however, deferred its review of OTC homeopathic products.  *See* 37 Fed. Reg. 9464 at 9466 (May 11, 1972).  FDA reasoned that "because of the *uniqueness of homeopathic medicine*," it would "exclude homeopathic drugs from the OTC drug review and to review them as a separate category at a later time after the OTC drug review was complete." *Id.* (emphasis added).

Congress also has recognized the unique nature of homeopathic drugs by including carve-outs for homeopathic treatments.  For example, in 2013, Congress specifically excluded homeopathic prescription drugs from the prescription drug track and trace requirements set forth in the Drug Quality and Security Act, as incorporated into section 581(13) of the FFDCA, thus assuring that homeopathic drugs could continue to be imported in the absence of an approved NDA.  *See* 21 U.S.C. § 360eee(13) ("The term 'product' means a prescription drug in a finished dosage form for administration to a patient without substantial further manufacturing […] but for purposes of section 360eee–1 of this title, does not include […] homeopathic drugs marketed in accordance with applicable guidance under this chapter[.]").  Additionally, in enacting OTC drug reform legislation in March 2020, Congress specifically excluded homeopathic drugs from the requirements of the new OTC drug monograph provisions under section 3853 of the CARES Act.  *See* H.R. 748 § 3853.

While Congress has repeatedly recognized that homeopathic drugs are unique, it also has recognized them as established and valid treatments.  Homeopathic drugs are explicitly acknowledged under section 301(g)(1) of the FFDCA, which defines a drug to include those "recognized in the official United States Pharmacopeia [or] *official Homœopathic Pharmacopœia of the United States*."  21 U.S.C. § 321(g)(1) (emphasis added).  Section 502(e)(3) of the FFDCA also provides that a drug labeled as homeopathic is misbranded unless it

bears the "established name" of that drug, with one source of established names including the

HPUS.  21 U.S.C. § 352(e)(3).

### 2. For over 30 years, FDA allowed and regulated the sale of homeopathic drugs under CPG 400.400.

After FDA decided not to consider homeopathic drug products as part of the OTC Drug

Review, it has made no effort to establish a review process for homeopathic drugs—either OTC

or prescription.  Instead, in 1988, FDA issued its guidance CPG 400.400, which delineated the

conditions under which homeopathic products may be legally marketed in the United States.  *See*

exhibit A – CPG 400.400.  Those conditions included a detailed set of labeling requirements and

other requirements designed to ensure the safe and appropriate use of homeopathic drugs.  *Id.*

Until late 2019, FDA managed the manufacture and sale of homeopathic drugs in the

United States under CPG 400.400.  The U.S. homeopathic drug industry has complied with those

requirements for decades to safely manufacture and distribute homeopathic products.

### 3. FDA recently departed dramatically from its longstanding policy regarding homeopathic drugs.

In 2017, FDA began a process that would upend its longstanding regulatory scheme.

Rather than announcing a specific review process for homeopathic drugs, FDA made available a

Draft Guidance entitled "Drug Products Labeled as Homeopathic."  *See* exhibit B – 2017 Draft

Guidance.  This 2017 Draft Guidance proposed to replace the CPG 400.400 with an approach

that would ultimately require all homeopathic drugs to obtain an NDA before being

manufactured and distributed.  *Id.* at 1, 3–5.  It also proposed to focus on removing from the

market certain "categories" of homeopathic products that FDA considers unsafe, including

injectable products.  *Id.* at 3–5.  The 2017 Draft Guidance clarified, however, that CPG 400.400

would remain in place until the new guidance was finalized.  *Id.* at 1.

Then, in October 2019, FDA issued a revised version of the Draft Guidance, entitled

"Drug Products Labeled as Homeopathic Guidance for FDA Staff and Industry," with minor

changes based on comments it had received, and asked for another round of comments. *See*

exhibit C – 2019 Draft Guidance.  But instead of waiting for that guidance to be finalized, FDA

withdrew CPG 400.400 immediately in a separate, corresponding action. *See* exhibit D – 84

Fed. Reg. 57439 (Oct. 25, 2019).  Neither FDA's withdrawal of CPG 400.400 nor the 2019 Draft

Guidance analyzed the reliance interests of homeopathic drug manufacturers or other parties who

had relied on CPG 400.400 for decades.

A number of comments from reputable members of the homeopathic community have

disputed FDA's pronouncement that injectable products raise safety concerns and have pointed

out that the categorical areas of concern listed in the 2019 Draft Guidance are vague and difficult

to enforce.[12]  Those commenters therefore requested that FDA withdraw the 2019 Draft

Guidance or revise it to include elements of CPG 400.400.  Congress has weighed in, too—in

support of the homeopathic community's concerns—in report language of the FY 2021

appropriations bill for Agriculture, Rural Development, Food and Drug Administration, and

---

[12] *See, e.g.*, Comments from the AAHP, dated May 19, 2020, at 1–5, 11, *available at* https://www.regulations.gov/document?D=FDA-2017-D-6580-32463; Comments from the HPCUS, dated May 19, 2020, at 2, *available at* https://www.regulations.gov/document?D=FDA-2017-D-6580-32710.  Similar comments also were filed in response to FDA's 2017 Draft Guidance.  *See* Comments from the American Association of Homeopathic Pharmacists ("AAHP"), dated May 18, 2018, at 2, 5–6, 9–11, *available at* https://www.regulations.gov/document?D=FDA-2017-D-6580-4647; Comments from the National Health Freedom Action, dated March 8, 2018, at 11–12, *available at* https://www.regulations.gov/document?D=FDA-2017-D-6580-2276; Comments from the Consumer Healthcare Products Association, dated May 14, 2018, at 3*, available at* https://www.regulations.gov/document?D=FDA-2017-D-6580-4766; Comments from the Homoeopathic Pharmacopoeia Convention of the United States ("HPCUS"), dated May 14, 2018, at 2, 5–6, 9–10, *available at* https://www.regulations.gov/document?D=FDA-2017-D-6580-4611.

Related Agencies.  Specifically, the appropriations bill instructed FDA "to consider the views of commenters, including patients, proponents of homeopathy, and other stakeholders, in its approach to finalizing its revised [2019] draft guidance."  *See* exhibit E – 2021 Appropriations Bill Report, at 86.

The 2019 Draft Guidance currently remains in draft form.  To date, FDA has not provided any response to the commenters' concerns or any support for its claims that prescription homeopathic injectable products are inherently unsafe when they are administered by medical practitioners and comply with FDA's manufacturing specifications and the conditions set out by the HPUS.  Yet, even though the 2019 Draft Guidance has not been finalized, the withdrawal of CPG 400.400 by itself fundamentally changed the regulatory scheme for homeopathic drugs because it removed FDA's decades-long assurance that homeopathic drugs could be marketed in the United States as long as they complied with the requirements of CPG 400.400.

### B.  FDA's Actions Regarding MediNatura's Products

#### 1.  MediNatura produces prescription homeopathic treatments that are a safe alternative to allopathic drugs.

MediNatura is a U.S. manufacturer, importer, and distributor of homeopathic drug products, including prescription injectable products.  *See* exhibit F – Cliff Clive Affidavit, at ¶ 6. Prior to its formation in 2014, MediNatura was the U.S. subsidiary of Biologische Heilmittel Heel GmbH ("Heel"), the second-largest homeopathic company in the world, which is headquartered in Germany.  *Id.* at ¶ 3.  MediNatura's mission is to provide effective medicines without serious or lethal side effects, thus offering medical practitioners and patients safe homeopathic remedies that reduce suffering and save lives.  *Id.* at ¶ 4.

MediNatura currently employs 50 full-time employees and sells a variety of prescription

and OTC products.  *Id.* at ¶¶ 5–6.  Over the past 18 years, MediNatura has distributed 5,128,989

prescription injectable products in the United States, which amounts to a total revenue of about

$50 million.  *See id.* at ¶ 8; *see also* exhibit G – MediNatura 2002–2020 U.S. Sales Summary.

This revenue constitutes 41% of MediNatura's business; the remaining 59% is split among

approximately 70 different OTC products.  *See* exhibit F – Cliff Clive Affidavit, at ¶ 8.

All of MediNatura's homeopathic products strictly follow FDA's labeling and other

requirements in CPG 400.400.  *Id.* at ¶ 13.  And they comply with FDA's current Good

Manufacturing Practices ("cGMPs"), drug establishment registration and drug product listing

regulations, and, if imported, import requirements that require inspection and release by both

FDA and the USCBP.  *Id.* at ¶ 14.

All of MediNatura's products also contain safe levels of active ingredients, as determined

by the HPUS.  *Id.* at ¶ 10.  The HPUS is the standard-setting body for legally recognized

homeopathic drugs marketed in the United States.  *Id.*  The HPUS also publishes rigorous

production standards for homeopathic drug manufacturers to ensure consumer protection,

including sterility requirements for injectable products (also known as parenterals).  *See* exhibit

CC – HPUS Guidelines for Manufacturing Homeopathic Medicines, *Section 53 – Methods of*

*Sterilization*.  It also specifies dilution requirements specific to each ingredient to assure their

safety.  *See* MediNatura, *Frequently Asked Questions*, *available at* https://medinatura.com/faqs/.

MediNatura's OTC products are manufactured in the company's facility in Albuquerque,

New Mexico, whereas its prescription products are manufactured in a German facility.  *See*

exhibit F – Cliff Clive Affidavit, at ¶ 9.  Both facilities are inspected regularly by FDA, with the

German facility also inspected by the relevant German authorities.  *Id.*

2.   **MediNatura and the entire homeopathic drug industry, medical practitioners, and patients have relied on FDA's regulatory scheme under CPG 400.400.**

By regulating homeopathic drugs under CPG 400.400 over 30 years, FDA has caused the homeopathic drug industry to rely on the understanding that homeopathic drugs, including injectable products, can be marketed and distributed in the United States as long as they comply with CPG 400.400.  *Id.* at ¶ 13.  FDA also has taken other affirmative steps that have further encouraged that reliance, including inspecting production facilities and ensuring that homeopathic drug manufacturers comply with its cGMPs.  *See, e.g.*, *id.* at ¶¶ 9, 14; *see also* exhibits DD – FDA Inspection Classification Results for MediNatura and Heel; H – FDA inspection letter for the Siegfried facility.

Like all other homeopathic drug manufacturers and distributors, MediNatura has relied on FDA's CPG 400.400.  *See* exhibit F – Cliff Clive Affidavit, at ¶ 13.  Demand for homeopathic products has expanded dramatically in recent decades, with over six million patients and consumers per year in the United States currently receiving homeopathic treatments.[13]  Patients have come to rely on MediNatura's prescription homeopathic injectable products to treat their symptoms in a safe manner, without needing to resort to riskier allopathic products like corticosteroids.  *Id.* at ¶ 16.  To help meet that demand, MediNatura has expanded its product lines and made improvements to its manufacturing facilities and systems, thus

---

[13] National Institutes of Health, *Homeopathy*, *available at* https://www.nccih.nih.gov/health/homeopathy (the NIH estimates that five million adults and one million children used homeopathy in 2011); *see also* Dossett, M. et al., *Homeopathy Use by US Adults: Results of a National Survey*. AMERICAN J PUBLIC HEALTH. 2016; 106: 743–45, *available a*t https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4816083/; Dossett, M. and Yeh G., *Homeopathy Use in the USA and Implications for Public Health: a Review*. HOMEOPATHY. 2018; 107(1): 3–9, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5989719/ (both articles note that just over 2% of U.S. adults use homeopathy).

incurring significant production and marketing costs. *Id.* at ¶ 17. MediNatura and other companies have also undertaken significant costs to comply with the labeling and other regulatory requirements of CPG 400.400. *Id.*

### 3. FDA's Import Alert suddenly banned import of all of MediNatura's prescription homeopathic injectable products.

On June 11, 2020, FDA issued a Warning Letter to MediNatura regarding its prescription homeopathic injectable products *Zeel*, *Traumeel*, *Engystol*, *Neuralgo Rheum*, *Lymphomyosot X*, and *Spascupreel* ("the Warning Letter"). *See* exhibit I. In the Warning Letter, FDA instructed MediNatura to stop distributing those six products until an NDA for these products has been approved by the Agency. *Id.* at 1, 3–4. The Warning Letter did not provide any data or specific evidence that MediNatura's products are unsafe or ineffective. Instead, FDA expressed its belief that the six MediNatura products may pose risks to patients due to their injectable nature and because they contain "potentially toxic or otherwise harmful ingredients," such as "mercurius solubilis" and "embryo totalis suis." *Id.* at 1.

On June 17, 2020, FDA added the six MediNatura injectable products to the Import Alert, which directs USCBP and FDA field offices to reject the entry of the Products into the United States. *See* exhibit J – Import Alert, at 112. FDA made that amendment without going through notice-and-comment rulemaking or providing any sort of notice to the public. Nor did FDA even provide notice to MediNatura. The Import Alert contained no explanation of why FDA determined that the Products should be denied entry into the United States. FDA's only statement related to the safety of any of the products listed on the Import Alert was that "unapproved drugs present serious safety and effectiveness concerns." *Id.* at 1. FDA also provided a generic statement that the listed products "appear[] to be a new drug within the meaning of Section 201(p) [of the FFDCA] without an effective new drug application (NDA)[.]"

*Id.*

### 4. Contrary to FDA's claims, MediNatura's prescription homeopathic injectable products are safe and thoroughly regulated.

MediNatura's injectable products have been marketed in the United States for at least the past 18 years. *See* exhibit F – Cliff Clive Affidavit, at ¶ 11. The homeopathic active ingredients contained in these injectable products are well known combinations that have been on the market for decades with no evidence of any safety issues. *See* exhibit K – MediNatura's Response to FDA's Warning Letter, at 2. Indeed, these ingredients have been monographed in the HPUS and are not toxic to patients when formulated in accord with the HPUS conditions. *Id.* Most of MediNatura's prescription injectable products are designed to treat chronic pain and are typically administered as three injections over a two-week course. *See* exhibit F – Cliff Clive Affidavit, at ¶ 6.

Despite over five million ampoules of MediNatura's injectable products sold in the United States over the past 18 years, *see* exhibit G – MediNatura 2002–2020 U.S. Sales Summary, only one serious ADR has been reported to the FDA Adverse Event Reporting System ("FAERS") webpage for one of the products.[14] *See* exhibit L – U.S. Safety Data for MediNatura Injectables. And there have been only 11 serious ADRs reported to the relevant authorities worldwide over the past 18 years for all six injectable products, compared with a total number of 328,362,572 ampoules sold. *See* exhibit M –Global Safety Data for MediNatura Injectables. In contrast, the number of serious ADRs reported for comparable allopathic drug products is orders

---

[14] As FDA acknowledges on the FAERS webpage, such a report does not establish causation. *See* FDA Adverse Event Reporting System (FAERS) Public Dashboard, *available at* https://www.fda.gov/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-public-dashboard. In other words, FDA emphasizes that reported adverse events might not be linked to a specific drug product since many other factors could be at play.

of magnitude higher, including a significant number of deaths. *See* exhibit N – FAERS ADR
Data for Corticosteroids. The allopathic drugs designed to treat conditions similar to
MediNatura's prescription injectable products include steroids and opioids. As just one example,
73,135 serious ADRs, including 12,690 deaths, have been reported for the corticosteroid
Prednisone in the United States over the past 18 years. *Id.* Overall, a total of 86,823 serious
ADRs, including 14,113 deaths, have been reported in the United States over the past 18 years
for the primary corticosteroid products listed in Exhibit N. *Id.*

Both human and animal studies have determined that all six MediNatura injectable
products are not toxic for human use. For instance, pre-clinical and clinical safety data for *Zeel*
and *Traumeel* show good tolerability and a low number of non-serious side effects following
parenteral administration of the products. *See* exhibits O – *Zeel* Study Data, at 11; P – *Traumeel*
Study Data, at 11. Similar results can be seen for all four remaining MediNatura injectable
products. *See* exhibits Q – *Engystol* Study Data, at 10; R – *Neuralgo Rheum* Study Data, at 5; S
– *Lymphomyosot X* Study Data, at 6; T – *Spascupreel* Study Data, at 6.

Additionally, the maximum content in MediNatura's *Traumeel* product of "mercurius
solubilis"—one of the ingredients FDA described as "potentially toxic" in its Warning Letter—is
far below any toxicity threshold. The amount of "mercurius solubilis" in each ampoule of
*Traumeel* is 0.00099 µg, which is well below[15] the calculated Permitted Daily Exposure ("PDE")
for mercury of 3 µg per day for a 50-kg adult. *See* exhibit U – Non-clinical Safety Assessment

---

[15] In other words, the 0.00099 µg of "mercurius solubilis" found in each ampoule of Traumeel is
only 1/60 of the PDE for that substance, meaning that a medical practitioner would need to inject
one patient over 60 times in one day to surpass the safe limit, which is impossible to do.

of Mercurius Solubilis, at 4.[16]  The "mercurius solubilis" content in *Traumeel* is even further

below the World Health Organization's "tolerable daily intake" of 2 micrograms of mercury per

kilogram of bodyweight, which amounts to 100 micrograms per day for a 50-kg adult.  *Id.* at 2.

And the HPUS monograph establishes the prescription potency of "mercurius solubilis" at

"3X,"[17] which is over 1000 times more concentrated than the "9.3X"[18] final dilution found in

MediNatura's *Traumeel* product.  *See* exhibit V – HPUS monograph of Mercurius Solubilis; *see*

*also* exhibit W – Effectiveness Material, at 1.[19]

    The amount of "mercurius solubilis" in *Traumeel* also is far below levels of mercury

FDA has recognized as safe in other injectable products.  Notably, common vaccines like those

for seasonal influenza and tetanus, diphtheria, and pertussis (known as "TDaP") contain

---

[16] PDE is a measure established by the International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use ("ICH"), of which FDA is a founding member, for assessing the "substance-specific dose that is unlikely to cause an adverse effect if an individual is exposed at or below this dose every day for a lifetime."  Exhibit X – EMA Guidelines on Exposure Limits, at 4.

[17] "1X" means the initial dilution of the ingredient, which is equal to 1 part the basic substance and 9 parts diluent (i.e., 1/10th of the original ingredient).  Following this process, "2X" means the dilution contains 1 part of a 1X dilution and 9 parts of diluent (1/100th), and "3X" means the dilution contains 1 part of a 2X dilution and 9 parts of diluent (1/1000th), and so forth.

[18] Although the potency level is "6X" for both the "mercurius solubilis" and "embryo suis," the final dilution levels, following production, for "mercurius solubilis" and "embryo suis" are equivalent to a "9.3X" and "9X" dilutions, respectively,  i.e., the ingredients are less concentrated in the final product when all other ingredients part of the specific formulas and the carrier liquid have been added together.

[19] Exhibit W includes information supporting the general recognition of effectiveness of the MediNatura injectable products.  First, it includes a listing of all the active ingredients of the six MediNatura prescription homeopathic injectable products, including their potency and final dilution levels as compared to the established HPUS Rx levels, and listings for each ingredient in the Clarke Dictionary of Practical Materia Medica and/or the Kent's Repertory of the Homoeopathic Materia Medica, two well respected publications used to establish the effectiveness of homeopathic remedies.  In addition, the exhibit includes excerpts from the Kent's Repertory specific to the ingredients in *Spascupreel* to demonstrate the efficacy information that is provided for each ingredient.  Finally, Exhibit W includes the published clinical study of the *Zeel* and *Traumeel* products, the MOZArT study.

thimerosal, which is approximately 50% mercury by weight.  Many versions of the seasonal

influenza vaccine contain 25 micrograms of mercury per dose, or *25,000 times* as much mercury

as in a single dose of *Traumeel*.  FDA has recognized the safety of the mercury in such vaccines,

finding that "[a] robust body of peer-reviewed scientific studies conducted in the U.S. and other

countries support the safety of thimerosal-containing vaccines."  FDA, *Thimerosal and Vaccines*

(Feb. 1, 2018), *available at* https://www.fda.gov/vaccines-blood-biologics/safety-availability-

biologics/thimerosal-and-vaccines.  FDA also specifically notes that "the evidence favors

rejection of a link between thimerosal and autism" and that "studies of the risk of other serious

neurodevelopmental disorders have failed to support a causal link with thimerosal."  *Id.*

Similarly, the maximum content of "embryo suis"—the other ingredient FDA described

as "potentially toxic"—found in each ampoule of *Zeel* is 0.002 µg, well below the most

restrictive Threshold of Toxicological Concern ("TTC") for this substance, which is set at 0.15

µg per day—a level 75 times higher than contained in the Product.  *See* exhibit Y – Non-clinical

Safety Assessment of Embryo Suis, at 3.[20]  Moreover, the HPUS monograph establishes the

prescription potency of "embryo suis" at "2X," which is 10 million times more concentrated than

the "9X"[21] final dilution of "embryo suis" found in MediNatura's *Zeel* product.  *See* exhibit Z –

HPUS monograph of Embryo Suis; *see also* exhibit W – Effectiveness Material, at 2.

MediNatura's injectable products are manufactured under a strict set of manufacturing

specifications and requirements, including FDA's.  To begin with, MediNatura's products are

produced under conditions consistent with FDA's cGMPs, which assure, among other things,

---

[20] TTC is a standard established by the ICH as a measure of "the genotoxic impurity exposure
level associated with a theoretical cancer risk of 1 additional cancer in 100,000 patients when
exposed over a life time."  Exhibit X – EMA Guidelines on Exposure Limits, at 7.

[21] *See supra* note 17.

dose-to-dose content uniformity and production under sterile conditions. *See* exhibit F – Cliff

Clive Affidavit, at ¶ 14.  MediNatura's prescription injectable products also comply with the

manufacturing and sterility standards of the German Homoeopathic Pharmacopeia (GHP –

Homöopathisches Arzneibuch or HAB) and the European Pharmacopoeia ("Ph. Eur.").  *Id.* at ¶

15.  And MediNatura's manufacturing facilities are subject to regular inspections by FDA and

the equivalent German authorities to confirm compliance with manufacturing standards.  *Id.* at ¶

9.  To comply with all of those requirements, the manufacturing facility operated by

MediNatura's supplier in Germany has in place a rigorous process to assure the sterility of the

MediNatura injectable products.  *See* exhibit AA – Sterility Statement.

Finally, an additional factor ensuring the safety of MediNatura's injectable products is that

they are available in the United States only by prescription.  *See* exhibit F – Cliff Clive Affidavit,

at ¶¶ 6–7.  Prescription medications can be dispensed only by practitioners "licensed by law" to

issue prescriptions—generally, doctors and licensed nurse practitioners.  *See* 21 U.S.C. § 353(b).

MediNatura sells its prescription injectable products directly to those doctors and other licensed

medical practitioners, who then administer the Products to patients. *See* exhibit F – Cliff Clive

Affidavit, at ¶ 7; *see also* exhibit BB – List of Doctors Prescribing MediNatura's Injectable

Products.  Doctors can also buy the Products through licensed prescription distributors, such as

McKesson.  *See* exhibit F – Cliff Clive Affidavit, at ¶ 7.  The prescription-only nature of

MediNatura's products thus ensures that a medical practitioner ultimately decides whether to

administer MediNatura's products and what dose is administered.  *Id.*  It also ensures that the

products are administered correctly and that patients are monitored for efficacy and any potential

side effects (though, as explained above, there are virtually no reported serious side effects in the

United States associated with the six MediNatura injectable products).  *Id.*

### 5. The Import Alert is catastrophic to MediNatura's business.

The Import Alert threatens the continued viability of MediNatura, which derives 41% of its revenue from the distribution and sale of the six imported injectable products. *Id.* at ¶ 8. That is a significant portion of MediNatura's business, especially considering that the remaining 59% of its revenue is split among approximately 70 different OTC products. *Id.* Because MediNatura only has a small inventory of its six injectable products currently in the United States, MediNatura will soon have none of those products to distribute or sell. *Id.* at ¶ 24. The unavailability of MediNatura's prescription injectable products will not only dramatically decrease MediNatura's revenue; it will also jeopardize MediNatura's base of customers for its other products and its business relationships with Heel, its German supplier, and its U.S. distributors. *Id.*

FDA has made clear that it plans to continue to deny entry to all overseas shipments of the six MediNatura injectable products until such time that the products have been approved by FDA as new drugs within the meaning of section 201 of the FFDCA. Other than review in this Court, no avenue for redress exists for MediNatura to prevent those harms.

### 6. The Import Alert is detrimental to the medical practitioners and patients who rely on MediNatura's products.

The Import Alert effectively removes the MediNatura injectable products from the U.S. market. That will greatly limit the choices available to thousands of medical practitioners,[22] who have been relying on those products to treat their patients for nearly 20 years. *See id.* at ¶¶ 16, 25. The resulting dearth of homeopathic injectable alternatives in the U.S. market likely will result in medical practitioners using allopathic drugs such as injectable steroids that present a

---

[22] *See* exhibit BB – List of Doctors Prescribing MediNatura's Injectable Products.

higher safety risk.  *Id.* at ¶ 25.  That dearth will be exacerbated by the fact that FDA has also issued similar warning letters and import alerts for the homeopathic drugs of three other manufacturers.  *See* FDA, *FDA Warns Four Manufacturers of Unapproved Injectable Drugs Labeled as Homeopathic*, dated June 16, 2020, *available at* https://www.fda.gov/news-events/press-announcements/fda-warns-four-manufacturers-unapproved-injectable-drugs-labeled-homeopathic.

As noted above, a total of 86,823 serious ADRs, including 14,113 deaths, have been reported in the United States over the past 18 years for the corticosteroid products listed in Exhibit N.  *See* exhibit N – FAERS ADR Data for Corticosteroids.  That renders steroids far riskier than MediNatura's products, for which there has been only one serious ADR reported and zero deaths in the United States over the course of 18 years and more than five million doses. *See* exhibits L – U.S. Safety Data for MediNatura Injectables; G – MediNatura 2002–2020 U.S. Sales Summary.

In addition, steroids are contraindicated for many patients suffering from heart conditions or diabetes, or for those taking other necessary medicines that may interact with steroids.  *See* exhibit F – Cliff Clive Affidavit, at ¶ 16.  Doctors may therefore be forced to either leave their patients in pain or alleviate their patients' symptoms through even riskier treatments like opioids.

Rather than use allopathic drugs to treat their patients, some medical practitioners may rely on homeopathic drug compounding to access similar injectable homeopathic products.  *Id.* at ¶ 25.  But compounded drugs are not subject to FDA's cGMP requirements.  21 U.S.C. § 503A(a); *see also* FDA Compounding Laws and Policies, *available at* https://www.fda.gov/drugs/human-drug-compounding/compounding-laws-and-policies.  As a result, compounded drugs may be produced under conditions that do not provide the same level

of quality and safety associated with drugs like MediNatura's that are manufactured in a cGMP-compliant drug manufacturing facility.

## III.   ARGUMENT

A four-part test governs requests for injunctive relief.  To determine whether to issue injunctive relief, a court must consider whether: "(1) the party seeking the injunction has a substantial likelihood of success on the merits; (2) the party seeking the injunction will be irreparably injured if relief is withheld; (3) an injunction will not substantially harm other parties; and (4) an injunction would further the public interest."  *Estate of Coll-Monge v. Inner Peace Movement*, 524 F.3d 1341, 1349 (D.C. Cir. 2008) (quoting *CSX Transp., Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005).  When the government is the offending party, factors three and four are considered together.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

Rather than giving equal weight to each of the factors, the factors are considered "on a sliding scale and must be balanced against each other."  *Davenport v. Int'l Bhd. of Teamsters, AFL-CIO*, 166 F.3d 356, 360–61 (D.C. Cir. 1999); *c.f. Seeger v. U.S. Dep't of* Def., 306 F. Supp. 3d 265, 278 (D.D.C. 2018) ("[I]t has long been held that the four factors are not equal.").  "'If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak.'"  *Estate of Coll-Monge*, 524 F.3d at 1349 (quoting *CSX Transp., Inc.*, 406 F.3d at 670).

### A.   MediNatura Is Likely to Succeed on the Merits of its Claims

#### 1.   MediNatura is likely to succeed on its claim that FDA departed from its previous regulatory regime without sufficient consideration of reliance interests.

Although an agency can change its policies, an agency that departs from its previous policy must "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'"  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016)

(internal quotation omitted).  It must assess the strength of those reliance interests and "weigh them against competing policy concerns." *Regents*, 140 S. Ct. at 1895.  If an agency chooses to change its policy in spite of serious reliance interests it has created, it must provide a "reasoned explanation" for doing so.  *Id.*  And even in the absence of reliance interests, an agency must at least acknowledge in its action that it is departing from its prior policy.  *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Here, all those that benefit from the homeopathic drug industry, including homeopathic drug manufacturers like MediNatura, medical practitioners, and patients, have relied on FDA's previous policy embodied in CPG 400.400.  FDA has encouraged that reliance through its actions.  It used CPG 400.400 as the operative regulatory system for homeopathic drugs for over 30 years, allowing homeopathic drugs to be marketed and sold in the United States as long as they were in compliance with that guidance.  And it also took other actions consistent with the understanding that homeopathic drugs in compliance with CPG 400.400 could be sold in the United States, such as inspecting homeopathic drug production facilities to ensure that they complied with FDA's manufacturing process requirements.

MediNatura and others in the homeopathic drug industry have made significant investments of time and money in reliance on CPG 400.400 and FDA's actions consistent with that guidance.  For example, MediNatura has worked to develop significant importing, manufacturing, and distribution infrastructure to meet the increasing demand for homeopathic drug products, including homeopathic injectable products.  It also has diligently ensured that all of its products comply with the requirements of CPG 400.400, including rigorous labeling specifications, requirements to maintain certain documentation, and a requirement to register as a drug establishment.  And MediNatura has complied with other FDA regulations applicable to its

operations, including cGMPs and packaging requirements.   FDA has not contended that MediNatura violated CPG 400.400 or any other regulatory requirement in marketing and selling its products.

Medical practitioners and patients also have come to rely on MediNatura's products to manage pain and other symptoms safely.   Over 5,000 medical providers have administered MediNatura's products to patients, together administering over 5 million doses to patients over the past 18 years.   *See* exhibit BB – List of Doctors Prescribing MediNatura's Injectable Products. And MediNatura is just one part of the homeopathic drug industry that treats about 6 million patients and consumers per year in the United States.   The withdrawal of CPG 400.400 and the addition of the Products to the Import Alert has upended those substantial reliance interests.

Indeed, MediNatura heavily relies on the ability to successfully market and distribute its six injectable products in the United States, as those products account for 41% of the company's revenue.   That revenue, totaling $4.31 million in 2019, supports jobs both in the United States and internationally.   The loss of such a significant portion of MediNatura's revenue will threaten its viability, its relationships with its distribution network of medical professionals throughout the United States, and the livelihoods of its employees.   And the medical providers who rely on the Products to manage their patients' symptoms will be forced to turn to riskier alternatives or go without treatment for those under their care.   *See* exhibit F – Cliff Clive Affidavit, at ¶ 16; *see also* exhibit BB – List of Doctors Prescribing MediNatura's Injectable Products.

Neither the withdrawal of CPG 400.400 nor the Import Alert provides any examination of these important and longstanding reliance interests.   The Import Alert does not even acknowledge any change in policy.   And although the withdrawal of CPG 400.400 recognizes FDA's policy change, FDA does not make any attempt to address the reliance interests of the homeopathic drug

manufacturers and distributors, medical practitioners, or patients, much less examine whether alternative actions could have been pursued or whether those reliance interests could have been accommodated.  Nor does FDA do so in the 2019 Draft Guidance or the Warning Letter issued to MediNatura.  Case law makes clear that FDA's complete failure to consider reliance interests renders its actions arbitrary and capricious.

The Supreme Court's recent decision in *Regents* is particularly instructive here.  In *Regents*, the Supreme Court vacated the decision of the United States Department of Homeland Security ("DHS") to rescind its Deferred Action for Childhood Arrivals ("DACA") immigration policy in part because DHS had failed to consider the reliance interests of recipients of deferred action under the program.  140 S. Ct. 1891 at 1913.  The Court found that DHS needed to, at a minimum, "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns."  *Id.* at 1915.  The Court emphasized that there were alternatives DHS could have adopted to accommodate reliance interests even if it chose to end the DACA program, such as adjusting the termination date of the program or allowing immigration officials to defer enforcement in certain cases on an individualized basis.  *Id.* at 1914.

DHS conceded in *Regents* that it had not considered the reliance interests of DACA recipients but argued that it did not need to because its previous policy was established through a guidance memorandum that "conferred no substantive rights."  *Id.* at 1913.  The Court rejected that argument, finding that individuals can have important reliance interests even if an agency's action is in the form of a non-binding memorandum because there is no "legal authority establishing that such features automatically preclude reliance interests[.]"  *Id.*

FDA's actions here are much like those vacated in *Regents*.  As in *Regents*, FDA's previous guidance document engendered substantial reliance interests because parties based important

decisions on it.  As in *Regents*, FDA departed from that guidance without considering how it would affect manufacturers and distributors of homeopathic drugs, medical practitioners, or patients. And as in *Regents*, FDA failed to analyze the alternatives it could have pursued to accommodate reliance interests.

FDA had multiple alternatives it should have evaluated to enable a realistic opportunity for MediNatura and other homeopathic drug manufacturers to market safe and effective homeopathic products even if it decided to withdraw CPG 400.400.  Homeopathic drugs are not allopathic drugs, but to be removed from the Import Alert under FDA's new policy, MediNatura and other homeopathic manufacturers and distributors will need to go through an NDA process that is not designed to consider evidence from the homeopathic community and requires prohibitively expensive studies that were never considered appropriate for homeopathic drug manufacturers. *See* Section A.4, *infra*; *see also* exhibit K – MediNatura's Response to FDA's Warning Letter, at 9; exhibit F – Cliff Clive Affidavit, at ¶ 19.  FDA could have fixed that issue in one of two main ways.  First, FDA could have instead created an NDA pathway for approval of homeopathic drugs that would take into account (a) Congress's intent to regulate these products differently from allopathic drugs, (b) FDA's own determination regarding the uniqueness of these products, and (c) evidence by experts in the field of homeopathy.  Second, FDA could have created a process that would review the GRAS&E status of drugs like MediNatura's that would consider the same types of homeopathic evidence.  And FDA also could have continued to permit the importation of the Products while it developed one or both of those new processes and provided an adequate period of time for MediNatura and other homeopathic drug manufacturers and distributors to adjust and comply before banning importation of homeopathic injectable drugs that have been safely and

widely used in this country for decades.  Yet, there is no evidence that FDA even considered those options.

If anything, the reliance interests are stronger here than in *Regents* because CPG 400.400 was in place for more than 30 years—six times longer than the DACA rule at issue in *Regents*. Those three decades that CPG 400.400 was in place made it particularly reasonable for participants in the homeopathic drug industry to rely on FDA's existing policy.  And MediNatura and other homeopathic drug manufacturers and distributors made substantial investments over that time period.  Those "decades of industry reliance" gave FDA a particularly heightened duty to consider parties' reliance interests and how its action would affect those interests.  *Encino Motorcars*, 136 S. Ct. at 2117.

FDA's utter disregard of the important reliance interests of homeopathic drug companies, medical practitioners, and patients—standing alone—requires vacatur of the withdrawal of CPG 400.400 and the Import Alert.  At a minimum, MediNatura has a strong likelihood of success on the merits of its claim that the withdrawal of CPG 400.400 and the issuance of the Import Alert should be vacated so that the Agency can conduct a proper analysis of the parties' reliance interests before determining whether and how to proceed.

### 2.  *MediNatura is likely to succeed on its claim that FDA's Import Alert did not comply with the rulemaking procedures of the APA.*

Under Section 553 of the APA, notice-and-comment rulemaking is required for all agency rules, unless Congress has required an even more stringent standard.  5 U.S.C. § 553.  In notice-and-comment rulemaking, an agency must: (1) post a notice of its proposed rule in the Federal Register; (2) provide an opportunity for interested parties to comment on that proposal; (3) consider relevant comments; and then (4) provide a basis and explanation for its final rule.  FDA performed none of those steps in issuing the Import Alert.

There are two limited exceptions to the requirement of notice-and-comment rulemaking, but neither applies here.

*First*, notice-and-comment rulemaking is not required for certain non-binding agency proclamations, including interpretive rules.  5 U.S.C. § 553(b)(3)(A).  Courts have frequently wrestled with the distinction between such interpretive rules and the "legislative rules" that require rulemaking procedures under the APA.  In general, "[a]n agency action that purports to impose legally binding obligations or prohibitions on regulated parties" is a legislative rule, while an action that "merely interprets a prior statute or regulation, and does not itself purport to impose new obligations or prohibitions or requirements on regulated parties" is an interpretive rule.  *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014).

The D.C. Circuit has recognized that the "crucial distinction" between the two is that a legislative rule "*modifies* or *adds* to a legal norm based on the agency's *own authority*."  *Syncor Intern. Corp. v. Shalala*, 127 F.3d 90, 95 (D.C. Cir. 1997) (emphasis in original).  Thus, when a rule "directly govern[s] the conduct of members of the public, affecting individual rights and obligations", such as by prohibiting sale of a product, it is "powerful evidence" that a rule is legislative.  *Guedes v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 920 F.3d 1, 18 (D.C. Cir. 2019).  And the way that the agency applies a rule is important—a rule will be considered legislative "if it appears on its face to be binding . . . or is applied by the agency in a way that indicates it is binding.'"  *Sec. Indus. & Fin. Markets Association v. U.S. Commodity Futures Trading Comm'n*, 67 F. Supp. 3d 373, 416 (D.D.C. 2014) (quoting *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002)).

Everything about the Import Alert demonstrates that it is a legislative rule.  The Import Alert directly regulates the rights of companies with products on the list by preventing the import

of those products.  The text of the Import Alert itself gives no indication that the Agency intended the Import Alert to be merely a statement of its thinking—to the contrary, the Import Alert directs FDA offices to detain shipments of drugs without physical examination.  *See* exhibit J – Import Alert, at 1.  And the Import Alert creates a binding requirement on MediNatura and other importers that did not exist before it was issued—prior to the Import Alert, companies could market the listed drugs in the United States, whereas afterwards those same drugs are subject to immediate detention by FDA district offices.

A strikingly similar FDA import alert was held to be a legislative rule requiring notice-and-comment in *Bellarno Int'l Ltd. v. Food & Drug Admin.*, 678 F. Supp. 410 (E.D.N.Y. 1988).  In *Bellarno*, FDA issued an import alert ordering the detention of shipments of pain relievers, which the Agency claimed were "new drugs" under the FFDCA that did not have an approved NDA.  *Id.* at 412.  The importer challenged the import alert for failing to comply with notice-and-comment procedures, and the court agreed, finding that the import alert was a legislative rule in part because it placed binding, substantive obligations on both the importer of the drugs and on FDA district offices.  *Id.* at 414.  FDA argued that the import alert was merely an advisory statement to agency staff that left them with discretion, pointing to a few instances in which shipments of the drug were let through by district offices.  *Id.*  The court disagreed, holding that the rule was intended as a substantive rule of general applicability and a "modicum of discretion" retained by district offices was not enough to render it an interpretive rule.  *Id.* at 415.

The Import Alert at issue here is functionally equivalent to the import alert in *Bellarno*—it instructs district offices which drugs are to be detained and even emphasizes that the drugs on the list are "generally not amenable to the use of enforcement discretion."  *See* exhibit J – Import Alert, at 2.  Accordingly, just as in *Bellarno*, the Import Alert cannot be understood as merely

-30-

providing recommendations to agency staff or otherwise explaining a non-binding agency interpretation.

*Second*, notice-and-comment procedures may be avoided when the agency for "good cause" finds that "notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B). The agency must explicitly include that good-cause finding, and "a brief statement of reasons therefor" in its rule. *Id.* FDA included no such finding in the Import Alert. And with good reason—there is no conceivable "good cause" why FDA would need to restrict imports of products that have been sold safely in the United States for decades. *C.f. Omnipoint Corp. v. F.C.C.*, 78 F.3d 620, 630 (D.C. Cir. 1996) (finding good cause for proceeding without notice and comment where the agency was under a Congressional deadline to act and where an unfair disadvantage for certain parties would have occurred without an expedited proceeding).

FDA's issuance of the 2019 Draft Guidance does not save its failure to use notice-and-comment procedures in the Import Alert. To begin with, FDA did not support the Import Alert based on the conclusions of the 2019 Draft Guidance or even mention it. Regardless, the 2019 Draft Guidance itself did not satisfy notice-and-comment procedures. Though FDA published notice of the 2019 Draft Guidance in the federal register and solicited comments, it has not yet finalized the guidance. To do so, FDA would need to consider comments it receives and publish a summary of the basis for the final action it chooses. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The 2019 Draft Guidance is also procedurally invalid for an additional reason—it places binding obligations on importers while purporting to be non-binding guidance. As recently recognized in Executive Order 13,891, it is inappropriate to regulate through guidance even when

guidance documents state that they are non-binding because they "carry the implicit threat of enforcement action if the regulated public does not comply."  Exec. Order No. 13,891, 84 Fed. Reg. 55,235 (Oct. 9, 2019).  FDA's imposition of the Import Alert imposing new approval requirements on homeopathic injectable drugs without notice-and-comment procedures is unlawful.  MediNatura's claim based on FDA's procedural failures has a strong likelihood of success on the merits.

### 3.   MediNatura is likely to prevail on its claim that FDA's assessment of the safety of MediNatura's products was arbitrary and capricious.

An agency rule "must examine the relevant data and articulate a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  Failure to do so renders an agency's action arbitrary and capricious.  *Id.*

The few disjointed lines of text in the Import Alert do not constitute a "satisfactory explanation" for FDA's action based on examination of "relevant data."  The only rationale for the detentions identified in the "reason for alert" section of the Import Alert is that "unapproved drugs present serious safety and effectiveness concerns."  *See* exhibit J – Import Alert, at 1.  Then, in a subheading entitled "charge," the Import Alert provides a generic statement that the listed ingredients "appear[] to be a new drug within the meaning of Section 201(p) [of the FFDCA] without an effective new drug application (NDA)[.]"  *Id.*  Neither of those statements explains why FDA has determined that drugs like the Products are not GRAS&E.  Nor do those statements present any data on the safety or effectiveness of these Products, much less a "rational connection" between the data and FDA's decision.  As a result, the Import Alert is arbitrary and capricious.

The reasoning supplied in the separate Warning Letter issued to MediNatura does not render the Import Alert non-arbitrary.  To begin with, as with the 2019 Draft Guidance, the

Warning Letter is not referenced in the Import Alert and is therefore not part of the Import Alert's administrative record.  But even if it were, the Warning Letter would not fix the problem because it is also arbitrary and capricious.  It both "fail[s] to consider an important aspect" of several issues and "offer[s] an explanation . . . that runs counter to the evidence"—hallmarks of arbitrary and capricious action under the APA.  *See State Farm*, 463 U.S. at 43.

*First*, the Warning Letter listing "mercurius solubilis" and "embryo suis" as "potentially toxic" ingredients rings hollow where it ignores the concentration of those ingredients in the Products.  The concentrations of both ingredients in the Products are fully consistent with the HPUS endorsed by Congress, *see* 21 U.S.C. § 321(g)(1), and are nowhere close to PDE or TTC levels.  For example, the level of mercury in MediNatura's *Traumeel* injectable product is 0.00099 micrograms per ampoule, thousands of times lower than the PDE of mercury, which is 3 micrograms per day for a 50-kilogram adult.  *See* exhibit U – Non-clinical Safety Assessment of Mercurius Solubilis, at 4.  It is even further below the World Health Organization's "tolerable daily intake" of 2 micrograms of mercury per kilogram of bodyweight, which amounts to 100 micrograms per day for a 50-kg adult.  *Id.* at 2.  And the "9.3X" final dilution used in *Traumeel* is also over one million times less concentrated than the "3X" maximum potency recognized in the HPUS monograph.  *See* exhibit V – HPUS monograph of Mercurius Solubilis; *see also* exhibit W – Effectiveness Material, at 1.  The "embryo suis" content in MediNatura's *Zeel* injectable product is similarly below thresholds set by public health agencies and the HPUS *See* exhibits Y – Non-clinical Safety Assessment of Embryo Suis, at 3; Z – HPUS monograph of Embryo Suis; W – Effectiveness Material, at 2.

Notably, the amount of mercury in *Traumeel* also is far below levels in common vaccines like those for seasonal influenza and tetanus, diphtheria, and pertussis (known as "TDaP").  Many

versions of the seasonal influenza vaccine contain 25 micrograms of mercury per dose, or *25,000 times* as much mercury as in a single dose of *Traumeel*.  FDA has recognized the safety of mercury in such vaccines, finding that "[a] robust body of peer-reviewed scientific studies conducted in the U.S. and other countries support the safety of thimerosal-containing vaccines."  FDA, *Thimerosal and Vaccines* (Feb. 1, 2018), *available at* https://www.fda.gov/vaccines-blood-biologics/safety-availability-biologics/thimerosal-and-vaccines.  FDA's conclusion that the miniscule amount of mercury in *Traumeel* is "potentially toxic" when it has already found that the much higher concentration in influenza vaccines is safe is a classic example of an agency decision that is contrary to available evidence and therefore arbitrary and capricious.

*Second*, FDA's categorical assumption that "injectable drug products can pose risks of serious harm to users," exhibit I – FDA Warning Letter, at 1, ignores that there is specific information available about the safety record of MediNatura's prescription injectable products.  Millions of doses of the Products have been sold in the United States over a span of 18 years, including almost three million doses of *Traumeel* alone.  Yet, there has been only one serious ADR reported to FDA (for *Traumeel*) and a handful of non-serious ADRs reported across all the Products.  *See* exhibit K – MediNatura's Response to FDA's Warning Letter, at 2 (Table 2).  The Products are thus dramatically safer than comparable treatments for the same symptoms, such as steroids and opioids.  For example, over the past 18 years, a total of 86,823 serious ADRs, including 14,113 deaths, have been reported in the United States for corticosteroid products such as Toradol, Prednisone, and Solumedrol.  *See* exhibit N – FAERS ADR Data for Corticosteroids.  Neither the Import Alert nor the Warning Letter provide any indication that FDA considered the long-demonstrated safety of MediNatura's Products—further demonstrating that its safety concerns are arbitrary and capricious.

*Third*, FDA failed to consider existing safeguards that ensure the safety and effectiveness of the Products.  MediNatura's prescription injectable products are manufactured and marketed according to several different regulatory and industry standards that assure their safety and their labeled identity, strength, and purity.  Those standards include FDA's cGMPs, as well as the manufacturing and sterility standards of the GHP and the Ph. Eur.  The Ph. Eur. sterility standards are equivalent to those of the USP, which the HPUS requires all injectable homeopathic products to meet.  The Products also have been sold and marketed under FDA's CPG 400.400, which establishes labeling and dosing requirements for homeopathic drugs.

The fact that the Products are only available through a prescription further ensures that they are used safely.  MediNatura's prescription injectable products are sold directly to doctors and other medical practitioners, so they are only administered when a medical practitioner consults with a patient and determines that the Products are appropriate to treat the patient's symptoms.  Medical practitioners also ensure that the Products are administered appropriately and can monitor patients for any side effects.

By failing to consider each of those factors indicating the safety of the Products and reaching a decision that runs counter to evidence available to the Agency, FDA acted arbitrarily and capriciously.  For these reasons, MediNatura has a strong likelihood of succeeding on its challenge to FDA's reliance on safety concerns for the justification for the Import Alert.

### 4.  *MediNatura is likely to succeed on its claim that FDA has arbitrarily failed to consider whether homeopathic drugs are GRAS&E or create an appropriate NDA process for homeopathic drugs.*

The FFDCA prevents the introduction into commerce of any "new drug" without an approved NDA.  21 U.S.C. § 355(a).  A "new drug" is in turn defined as a drug that is "not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed,

recommended, or suggested in the labeling thereof." 21 U.S.C. § 321(p)(1). Conversely, products that are generally recognized as safe and effective ("GRAS&E") are not new drugs.

There are thus two ways for most drugs to be sold and marketed: through an approved NDA or a recognition that they are GRAS&E. But neither FDA's NDA process nor its process for determining GRAS&E status is appropriate for homeopathic drugs. The agency designed the current NDA pathway with new allopathic drugs in mind. That pathway fails to account for the unique qualities of homeopathic drugs or evidence by experts in the field of homeopathic medicine. It is also prohibitively expensive for homeopathic drugs like those produced by MediNatura. MediNatura conducted one large-scale, double-blind, controlled study for two of its highest-selling injectable products (*Zeel* and *Traumeel*) that cost about $4 million—conducting the two or more such tests required for an NDA for each of MediNatura's six injectable products would cost at least $48 million. *See* exhibit F – Cliff Clive Affidavit, at ¶ 26. That unnecessary burden bears no rationale relationship to the economic position of these products. MediNatura's products are among the most widely used homeopathic injectable products in the U.S., and yet they have brought in only about $50 million in revenue across all the Products over the past 18 years, an average of about $2.8 million per year. It would be impossible for MediNatura and other homeopathic drug makers and distributers to finance the required studies for the type of NDA application that is ordinarily completed by large pharmaceutical companies for new allopathic drugs. *Id.*

FDA's GRAS&E requirements were similarly designed with allopathic drugs in mind and poorly suited for the unique qualities of homeopathic drugs.[23] Moreover, FDA has made no effort

---

[23] *See* FDA, *Regulation Overview: GRASE*, *available at* https://www.accessdata.fda.gov/scripts/cder/training/OTC/topic3/topic3/da_01_03_0040.htm.

to determine whether any homeopathic drugs are GRAS&E.  It specifically declined to do so as part of its OTC Drug Review process, instead vowing to "review them as a separate category at a later time" for the specific reason that it needed to account for "the uniqueness of homeopathic medicine." 37 Fed. Reg. 9464 at 9466 (May 11, 1972).  It never conducted that review, and now it seeks to impose the NDA pathway designed for new allopathic drugs—abandoning without explanation its commitment to review homeopathic drugs "as a separate category" and to account for "the uniqueness" of homeopathic drugs.

Having previously determined not to condition importation of homeopathic drugs on either the NDA or GRAS&E pathways, FDA instead has for decades managed the importation and marketing of homeopathic drugs under CPG 400.400.  Now that CPG 400.400 has been withdrawn, there is effectively no viable path for importing or marketing homeopathic injectable products.  In order to be removed from the Import Alert, MediNatura and other homeopathic drug manufacturers would need to either complete a prohibitively expensive NDA and have it approved without consideration of homeopathic evidence or obtain a GRAS&E determination from FDA, when the agency has never made any attempt to determine whether homeopathic drugs are GRAS&E or even created a process for doing so.

 FDA could have fixed these problems.  It could have created a review process that would take into account information from experts in the homeopathic community about the safety and effectiveness of homeopathic products.  Indeed, the FFDCA specifies that GRAS&E is to be determined based on general recognition "among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs," 21 U.S.C. § 321(p)(1), which includes homeopathic drugs.  21 U.S.C. § 321(g)(1).  Providing a different process for NDA applications or GRAS&E determinations for homeopathic drugs would be consistent with

Congress's repeated recognition that homeopathic medicine is unique. *See* Section A.1, *supra*. It would also be consistent with FDA's deferral of the OTC review process for homeopathic drugs "because of the uniqueness of homeopathic medicine," 37 Fed. Reg. 9464 at 9466, as well as the Agency's recognition in CPG 400.400 that it would not apply certain testing requirements to homeopathic drugs "due to the unique nature of these drug products." *See* exhibit A – CPG 400.400 at 6. As part of such a process, FDA could consider evidence that a homeopathic drug has a long history of being marketed and safely used in the United States to present a *prima facie* case that it is GRAS&E, just as Congress recently clarified for OTC drugs in the CARES Act. Pub. L. No. 116-136 (2020) (amending Section 505(G) of the FFDCA).

Yet, FDA failed to engage in any analysis of whether the Products are GRAS&E or whether the uniqueness of homeopathic injectable drugs that have long been used to safely treat patients in the United States warrant a different approval process than that used for new allopathic drugs. That failure is arbitrary, contrary to the FFDCA, and contrary to FDA's own acknowledgements about the unique nature of homeopathic drugs. The Agency has reneged on its longstanding commitment to establish a separate review process for homeopathic drugs that treats them "as a separate category" and accounts for their "uniqueness." 37 Fed. Reg. 9464 at 9466 (May 11, 1972). And it has provided no explanation or justification for its sudden about-face, nor has it acknowledged—much less carefully accounted for—the considerable reliance interests created by its prior commitments.

If FDA had considered those issues, there are several pieces of evidence that would have demonstrated the Products are GRAS&E, or that an alternative NDA approval process is warranted in this context. First, all ingredients in the Products are listed in the HPUS, which is compiled by experts in homeopathic medicine and is recognized as the official set of industry standards for

homeopathic drugs marketed in the United States.  The HPUS includes rigorous production standards for homeopathic drug manufacturers to ensure consumer protection, including sterility requirements and dilution requirements specific to each ingredient.  And Congress has expressly recognized and endorsed the HPUS.  *See* 21 U.S.C. § 321(g)(1).

Second, the safety and efficacy of the ingredients in the Products is supported by substantial homeopathic published literature.  *See, e.g.*, exhibits O – Zeel Study Data; P – Traumeel Study Data; Q – Engystol Study Data; R – Neuralgo Rheum Study Data; S – Lymphomyosot X Study Data; T – Spascupreel Study Data; *see also* exhibit W – Effectiveness Material.  Those studies constitute the best available evidence from "experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs," as homeopathic practitioners and researchers are the best suited to evaluate the effectiveness of products in their field.

Third, millions of doses of the Products have been prescribed safely by medical practitioners for at least 18 years, with far fewer adverse results than comparable allopathic treatments.  Considering a drug with such a proven track record as a "new drug" would read the word "new" out of the statute.  Congress is presumed to use terms in statutes in a way that they have at least some meaning.  *See Rapanos v. United States*, 547 U.S. 715, 779 (2006) (Scalia, J., concurring) (noting "the need to give the term 'navigable' some meaning" in the Clean Water Act). The only way for the word "new" in the FFDCA to mean something is if a drug that has been used for decades and is demonstrably safer than alternatives is considered GRAS&E rather than a "new drug."

FDA failed to undertake any assessment of that information to examine whether the Products are GRAS&E when issuing the Import Alert.  Even the separate Warning Letter sent to MediNatura failed to analyze that issue, simply stating with no support that the Products are "not

generally recognized as safe and effective" and therefore are "'new drugs' as defined by [section] 201(p) of the FD&C Act." *See* exhibit I – FDA Warning Letter, at 3.

FDA's failure to consider whether the Products and other homeopathic drugs are GRAS&E or whether an alternative NDA process is warranted for homeopathic drugs is arbitrary and capricious under Section 706 of the APA and contrary to Section 201(p)(1) of the FFDCA, 21 U.S.C. § 321(p)(1).

## B.  <u>MediNatura Will Suffer Irreparable Harm Absent an Injunction</u>

There are several ways that harm to a plaintiff can be considered irreparable.  To begin with, economic harms are irreparable where no other relief is available.  *See Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*, 317 F. Supp. 3d 555, 563 (D.D.C. 2018) (finding "millions of dollars" of costs to be incurred by companies to meet FDA's labeling criteria were an irreparable injury); *Clarke v. Office of Fed. Hous. Enter. Oversight*, 355 F. Supp. 2d 56, 65 (D.D.C. 2004) ("[C]ourts have recognized that economic loss may constitute 'irreparable harm' where a plaintiff's alleged damages are unrecoverable.").  Such economic injury need not be fatal to an organization to support a finding of irreparable harm.  *See Smoking Everywhere, Inc. v. U.S. Food & Drug Admin.*, 680 F. Supp. 2d 62, 77 n. 19 (D.D.C. 2010).  Alternatively, a movant may show irreparable harm even with a *recoverable* economic injury if the loss threatens the viability of the movant's business. *See Wisconsin Gas Co.*, 758 F.2d at 674.  Harm to an organization may also be irreparable "if the actions taken by the defendant have 'perceptibly impaired' the organization's programs." *League of Women Voters,* 838 F.3d at 8.  Such impairment occurs when a defendant's actions 'directly conflict with the organization's mission." *Id.* (holding that voter registration laws requiring voters to prove citizenship interfered with plaintiff's mission of registering voters).

Allowing FDA's Import Alert and withdrawal of CPG 400.400 to stand will irreparably harm MediNatura in all three of those ways.  *First*, MediNatura will suffer irreparable harm

because, absent an injunction, it has no adequate remedy.  "Where a plaintiff cannot recover damages from an agency because the agency has sovereign immunity, 'any loss of income suffered by [the] plaintiff is irreparable *per se*.'"  *See Smoking Everywhere, Inc.*, 680 F. Supp. 2d at 77 n. 19 (internal quotation omitted).  When MediNatura's existing inventory of the Products subject to the Import Alert runs out, the losses to MediNatura "would be unrecoverable, leaving Plaintiffs with no remedy to restore themselves 'to the status quo ante.'"  *See Cigar Ass'n of Am.*, 317 F. Supp. 3d at 563 (quoting *Mann v. Wash. Metro. Transit Auth.*, 185 F. Supp. 3d 189, 195 (D.D.C. 2016).  Because no "adequate compensatory or other corrective relief will be available at a later date," *Clarke*, 355 F. Supp. 2d at 65, MediNatura will be irreparably harmed absent an injunction.

*Second*, detaining the Products listed on the Import Alert will threaten the viability of MediNatura's business given that distribution of the Products represents 40% of MediNatura's revenue and its entire inventory of prescription injectable drugs.  The remaining 60% of MediNatura's revenue comes from approximately 70 OTC products.  Thus, although the Import Alert prevents the sale of only a handful of MediNatura's products, the Import Alert will destroy a major portion of the company's revenue.  Moreover, preventing the sale of the Products will have additional negative impacts, including upsetting MediNatura's contract with its German supplier and U.S. distributors and potentially causing MediNatura to lose customers who also purchase MediNatura's OTC products after using its prescription injectable drugs.  *See Tom Doherty Assocs., Inc. v. Saban Entm't Inc.*, 60 F.3d 27, 38 (2d. Cir. 1995) (finding injunctive relief appropriate in a case where a product "increases business of the plaintiff beyond sales of that product—for example, by attracting customers who make purchases of other goods while buying the products in question").  It could also disrupt MediNatura's relationships with the thousands of medical providers who rely on MediNatura's products to treat their patients' symptoms safely.

*Third,* FDA's actions "directly conflict with [MediNatura's] mission" to bring natural remedies to its customers, reduce the suffering of thousands, and save lives. *League of Women Voters,* 838 F.3d at 8. The Import Alert will interfere with those goals by preventing the sale and distribution of safe homeopathic injectable drugs that serve as a substitute for corticosteroids and other drugs that have caused thousands of serious ADRs and deaths. *See* Section III.C, *infra*.

### C.  <u>Neither Defendants Nor the Public Interest Would Be Harmed By an Injunction</u>

Because the Government is assumed to be acting in the public interest, the harm to the opposing party factor and the public interest factor "merge when the Government is the opposing party." *Nken*, 556 U.S. at 420. But "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12. Instead, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). Here, the public interest weighs in favor of granting a preliminary injunction to prevent FDA's unlawful actions and preserve the status quo.

Without a preliminary injunction, the public will lose access to a set of widely used homeopathic treatments proven to be safe alternatives to riskier treatments like corticosteroids. As noted above, more than 86,000 serious ADRs and over 14,000 deaths have been reported as a result of corticosteroid use over the past 18 years. If the Import Alert remains in place, many patients will likely turn to riskier injectable corticosteroids, and some of those patients will likely experience ADRs, including serious ones. Moreover, injectable corticosteroids are contraindicated for many patients suffering from heart conditions or diabetes, or for those taking other necessary medicines that may interact with corticosteroids. Allowing the import ban to stand could thus place medical practitioners in the difficult position of either alleviating their patients' pain through the use of potentially riskier alternatives or leaving their patients' pain untreated. As a way around

that dilemma, some practitioners might turn to compounding their own homeopathic injectable products.  But compounding injectable drugs in that manner would present its own set of risks because, unlike the Products, such compounded drugs would not be manufactured in a facility that complies with FDA's cGMPs that ensure manufacturing quality and safety.  21 U.S.C. § 503A(a) (compounded drugs are not subject to FDA's cGMP production processes); *see also* FDA Compounding Laws and Policies, *available at* https://www.fda.gov/drugs/humandrug-compounding/compounding-laws-and-policies.

Additionally, the withdrawal of CPG 400.400 removes a set of labeling and other requirements that helped to ensure the safe and accurate marketing of homeopathic products. Because FDA has not finalized the 2019 Draft Guidance, there is currently no regulatory scheme for homeopathic drugs in place.  And even if it is ultimately finalized, the 2019 Draft Guidance does not contain much of the important regulatory framework of CPG 400.400.[24]  Thus, if the withdrawal of CPG 400.400 remains in effect, it could lead to fraudulent or mislabeled homeopathic products entering the market.[25]

There is no countervailing public interest that weighs in favor of maintaining the Import Alert.  For all the reasons discussed above, FDA's suggestion that the Products could be dangerous is utterly unfounded.  MediNatura's prescription injectable products have been used in the United States for almost two decades, with next to no reported adverse reactions.  *See* Section A.4, *supra*. The Products are also subject to additional safeguards that ensure their safety and labeled identify,

---

[24] *See, e.g.*, Comments from the HPCUS, dated May 14, 2018, at 2, 5–6, 9–10, *available at* https://www.regulations.gov/document?D=FDA-2017-D-6580-4611; Comments from the AAHP, dated May 18, 2018, at 2, 6–14, *available at* https://www.regulations.gov/document?D=FDA-2017-D-6580-4647.

[25] *See, e.g.*, Comments from the AAHP, dated May 18, 2018, at 1, *available at* https://www.regulations.gov/document?D=FDA-2017-D-6580-4647.

strength, and purity, including FDA's cGMPs and the standards of both the GHP and Ph. Eur.  And because the Products are offered only through prescription, their use is managed through the guidance of licensed medical practitioners.  These long-used drugs that have been safely prescribed by licensed medical professionals for decades are not suddenly unsafe merely because they do not have a new drug application—a regulatory requirement FDA never required until its recent about-face.

Because there is no safety risk from the continued sale of the Products, there is no reason that FDA needs to halt their import immediately.  If FDA wants to change the way it regulates prescription homeopathic injectable products like MediNatura's, it can wait to do so through appropriate regulations that have gone through the notice-and-comment process and that provide a non-arbitrary explanation for its actions, including a careful consideration of decades-long reliance interests created by FDA's own actions.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, MediNatura respectfully requests that the Court grant a preliminary injunction or a temporary restraining order enjoining the withdrawal of CPG 400.400 and the enforcement of the Import Alert.