**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MEDINATURA, INC.,

      *Plaintiff,*

      v.

UNITED STATES FOOD AND DRUG
ADMINISTRATION, *et al.,*

      *Defendants.*

Civil Action No. 1:20-cv-02066-RDM

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS
<u>AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION</u>**

**TABLE OF CONTENTS**

I.   INTRODUCTION ...........................................................................................................................1

II.  BACKGROUND.............................................................................................................................3

    A.   STATUTORY AND REGULATORY BACKGROUND. .........................................................3

        1.   The Drug Review and Approval Process ...............................................................3

        2.   FDA's Import Program..........................................................................................5

        3.   Import Alert 66-41 ................................................................................................7

        4.   FDA's Enforcement Policies Regarding Homeopathic Drugs ..............................7

    B.   FACTUAL AND PROCEDURAL BACKGROUND...............................................................12

III. STANDARD OF REVIEW...........................................................................................................14

    A.   FDA'S MOTION TO DISMISS FOR LACK OF JURISDICTION .....................................14

    B.   MEDINATURA'S MOTION FOR A PRELIMINARY INJUNCTION ...............................15

IV.  ARGUMENT................................................................................................................................15

    A.   THE COURT SHOULD DISMISS MEDINATURA'S COMPLAINT. ................................16

        1.   MediNatura's Claims Are Not Ripe and Fail to State a Claim............................16

            a.   MediNatura's Claims Are Unripe and Its Complaint Fails to State a Claim
               Because MediNatura Does Not Challenge Final Agency Action or Reviewable
               Lack of Act ....................................................................................................17

               i.    FDA's withdrawal of CPG 400.400 was not final agency action....................18

               ii.   FDA's addition of MediNatura's injectable drugs to IA 66-41 was not
                    final agency action..................................................................................19

               iii.  MediNatura does not allege that FDA failed to take a discrete action it was
                    required to take.......................................................................................21

             b.   MediNatura Has Not Alleged that It Will Suffer Immediate and Significant
               Hardship Sufficient to Outweigh the Interest in Deferring Review ...................22

        2.   FDA's Withdrawal of the CPG Is Not Reviewable Under the APA .................................23

        3.   MediNatura Lacks Standing to Bring Count IV .................................................................25

        4.   To the Extent MediNatura's Complaint Could Be Interpreted to Allege that FDA Acted
           Arbitrarily and Capriciously By Not Determining that Its Injectable Drugs Are
           GRAS/E, MediNatura Has Not Exhausted Its Administrative Remedies ......................26

    B.   THE COURT SHOULD DENY MEDINATURA'S MOTION FOR A PRELIMINARY
       INJUNCTION.............................................................................................................................28

1.  MediNatura Has Failed to Show It Is Likely to Succeed on the Merits of Its Claims that FDA Violated the APA by Acting Arbitrarily and Capriciously and Failing to Conduct Notice-and-Comment Rulemaking..........................................................................................29

    a.  FDA Was Not Required to Consider MediNatura's Alleged Reliance Interests and Even If It Were, FDA Adequately Considered Such Alleged Interests.........29

    b.  FDA's Addition of MediNatura's Unapproved Injectable Drugs to IA 66-41 Was Not Arbitrary or Capricious ...............................................................32

    c.  FDA's Addition of MediNatura's Unapproved Injectable Drugs to IA 66-41 Was Not Arbitrary or Capricious ...............................................................33

    d.  FDA Did Not Act Arbitrarily and Capriciously by Failing to Establish a Separate NDA Process or a New GRAS/E Standard for Homeopathic Drugs..36

    e.  To the Extent MediNatura's Complaint Could Be Interpreted to Allege that FDA Acted Arbitrarily and Capriciously by Not Determining that Its Injectable Drugs Are GRAS/E, Such a Claim Is Not Likely to Succeed.............37

2.  MediNatura Has Not Shown Irreparable Harm...................................................39

3.  The Balance of Equities and Public Interest Weigh Against Junctive Relief. ..................41

V.  CONCLUSION ........................................................................................................43

## TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967)............................................................16

*Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524 (D.C. Cir. 2015)...........................14

*Abhe v. Svoboda, Inc. v. Chao*, 508 F.3d 1052 (D.C. Cir. 2007) ...................................15

*Action on Smoking & Health v. Dep't of Labor*, 28 F.3d 162 (D.C. Cir. 1994) .....................18

*Am. Meat Inst. v. U.S. Dep't of Agric.*, 968 F. Supp. 2d 38 (D.D.C. 2013).........................40

*Am. Petroleum Inst. v. Envtl. Prot. Agency*, 683 F.3d 382 (D.C. Cir. 2012) ........................17

*Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.*, 738 F.3d 387 (D.C. Cir. 2013) .........18

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Chao*, 493 F.3d 155 (D.C. Cir. 2007) ......................27

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710 (D.C. Cir. 2015) ....................34

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................14

*Bellarno Int'l Ltd. v. Food & Drug Admin.*, 678 F. Supp. 410 (E.D.N.Y. 1988) ...................36

*Bennett v. Spear*, 520 U.S. 154, (1997)..............................................17, 19

*Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533 (D.C. Cir. 1986) ......................34, 35

*Brown v. District of Columbia*, 888 F. Supp. 2d 28 (D.D.C. 2012) ...........................39

*Cal. Ass'n of Private Postsecondary Sch. v. DeVos*, 344 F. Supp. 3d 158 (D.D.C. 2018)............15, 39, 40

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ...................................25

*Competitive Enter. Inst. v. Envtl. Prot. Agency*, 153 F. Supp. 3d 376 (D.D.C. 2016) ................14

*Conservation Force, Inc. v. Jewell*, 733 F.3d 1200 (D.C. Cir. 2013) ...........................14

*Cutler v. Kennedy*, 475 F. Supp. 838 (D.D.C. 1979) ...................................32

*Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019)..................................32

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020)...................24, 31

*Devia v. Nuclear Regulatory Comm'n*, 492 F.3d 421 (D.C. Cir. 2007) ...........................22

*Direct Mktg. Concepts, Inc. v. Fed. Trade Comm'n*, 581 F. Supp. 2d 115 (D. Mass. 2008) ................21

*Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 2117 (2016) ...............................30

*Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594 (1950) .......................................................21

*Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ..........................30

*Garlic v. U.S. Food & Drug Admin.*, 783 F. Supp. 4 (D.D.C. 1992).........................................27

*\*Heckler v. Chaney*, 470 U.S. 821, 831 (1985)................................................................. 23, 24

*\*Holistic Candlers & Consumers Ass'n v. Food & Drug Admin.*, 664 F.3d 940 (D.C. Cir. 2012) ................. 17, 21

*Hormel Foods Corp. v. U.S. Dep't of Agric.*, 808 F. Supp. 2d 234 (D.D.C. 2011) ...................17

*In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46 (D.D.C. 2016).....................14

*Jackson v. Mabus*, 808 F.3d 933 (D.C. Cir. 2015) ...................................................................33

*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) .....................41

*Lystn, LLC v. Food & Drug Admin.*, 10-cv-01943, 2020 WL 248962 (D. Co. Jan. 16, 2020)..........................18

*McKart v. United States*, 395 U.S. 185 (1969).........................................................................27

*Meserey v. United States*, 447 F. Supp. 548 (D. Nev. 1977) .......................................................5

*Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29 (1983) .....................32

*Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41 (1938) ...................................................27

*Nat. Res. Def. Council, Inc. v. U.S. Nuclear Regulatory Comm'n*, 680 F.2d 810 (D.C. Cir. 1982) ..........................18

*Nat'l Ass'n of Home Builders v. Envtl. Prot. Agency*, 667 F.3d 6 (D.C. Cir. 2011)......................14

*Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of Fed. Reserve Syst.*, 773 F. Supp. 2d 151 (D.D.C. 2011)..........41

*Nat'l Gay Rights Advocates v. HHS*, No. 87-1735, 1988 WL 43833, (D.D.C. Apr. 26, 1988) .........................27

*Nat'l Med. Enters., Inc. v. Shalala*, 43 F.3d 691 (D.C. Cir. 1995).........................................34

*Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34 (D.D.C. 2011) ...........................................40

*Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243 (D.C. Cir. 2014) .......................................20, 34

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803 (2003)...........................................16

*Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305 (D.C. Cir. 1987) ...........................................15

*Nevada v. Dep't of Energy*, 457 F.3d 78 (D.C. Cir. 2006)..............................................16, 23

*Nken v. Holder*, 556 U.S. 418 (2009)......................................................................................41

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004)..............................................................22

*Nuclear Energy Inst., Inc. v. Envtl. Prot. Agency*, 373 F.3d 1251 (D.C. Cir. 2004) ........................... 18, 23

*Obama v. Klayman*, 800 F.3d 559 (D.C. Cir. 2015) ..................................................................15

*Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726 (1998) ...............................................16

*Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33 (D.C. Cir. 1974) ...................... 34, 35

*Panhandle Producers & Royalty Owners Ass'n v. Econ. Regulatory Admin.*, 847 F.2d 1168 (5th Cir. 1988)............35

*Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015) ................................................................34

*Perez v. Nidek Co.*, 711 F.3d 1109 (9th Cir. 2013) .................................................................20

*Pharm. Research & Manufs. of Am. v. HHS*, 138 F. Supp. 3d 31 (D.D.C. 2015) ......................18

*Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190 (D.D.C. 2005) ......................................40

*Premo Pharm. Labs., Inc. v. United States*, 629 F.2d 795 (2d Cir. 1980) ..................................38

*Professionals and Patients for Customized Care v. Shalala*, 56 F.3d 592 (5th Cir. 1995) ...............35

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726 (D.C. Cir. 2003) ......................17

*Royster-Clark Agribusiness, Inc. v. Johnson*, 391 F. Supp. 2d 21 (D.D.C. 2005) ......................21

*Ryder Truck Lines, Inc. v. United States*, 716 F.2d 1369 (11th Cir. 1983) ...............................35

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011) ...............................................................15

*Solenex, LLC v. Bernhardt*, 962 F.3d 520 (D.C. Cir. 2020) ...................................................29

*Soundboard Ass'n v. U.S. Fed. Trade Comm'n*, 254 F. Supp. 3d 7 (D.D.C. 2017)................... 39, 41

*Southeastern Minerals, Inc. v. Harris*, 622 F.2d 758 (5th Cir. 1980) ......................................21

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) .....................................................................25

*Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270 (D.C. Cir. 2016) ..............................18

*United States v. 225 Cartons, More or Less of an Article or Drug*, 871 F.2d 409 (3d Cir. 1989)...............39

*United States v. Atropine Sulfate 1.0 mg (Article of Drug) Dey Dose*, 843 F.2d 860 (5th Cir. 1988) .....................39

*United States v. Generix Drug Corp.*, 460 U.S. 453 (1983) ....................................................38

*Util. Air Regulatory Grp. v. Envtl. Prot. Agency*, 573 U.S. 302 (2014) ...................................32

*Versata Dev. Corp. v. Rea*, 959 F. Supp. 2d 912 (E.D. Va. 2013) ...........................................21

*\*Weinberger v. Bentex Pharms., Inc.*, 412 U.S. 645 (1973) ............................................... 37, 38

*Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609 (1973) ............................................................. 26, 38

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ............................................................................. 15

*Wis. Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669 (D.C. Cir. 1985) ................................. 41

*Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43 (D.C. Cir. 1999) ........................................... 17

**Statutes**

21 U.S.C. § 321(b) .................................................................................................................................. 5

21 U.S.C. § 321(g) .............................................................................................................................. 4, 5

21 U.S.C. § 321(p) ............................................................................................................. 4, 22, 31, 37

21 U.S.C. § 331 ..................................................................................................................................... 13

21 U.S.C. § 331(d) ............................................................................................................................... 33

21 U.S.C. § 351 ..................................................................................................................................... 43

21 U.S.C. § 353(b)(1)(A) ..................................................................................................................... 12

21 U.S.C. § 355 ......................................................................................................................... 3, 4, 5, 22

21 U.S.C. § 355(a) ............................................................................................................................... 3, 5

21 U.S.C. § 355(b) ................................................................................................................................. 4

21 U.S.C. § 355(c) ................................................................................................................................. 4

21 U.S.C. § 355(d) ................................................................................................................................. 4

21 U.S.C. § 355h .................................................................................................................................. 32

21 U.S.C. § 381(a) ...................................................................................................................... 5, 6, 33, 34

21 U.S.C. § 381(b) ................................................................................................................................. 6

21 U.S.C. § 706 .................................................................................................................................... 22

21 U.S.C. § 706(1) ............................................................................................................................... 22

21 U.S.C. § 706(2)(A) ...................................................................................................................... 22, 32

21 U.S.C. § 706(2)(C) .......................................................................................................................... 22

42 U.S.C. § 262(i)(1) ............................................................................................................................. 4

42 U.S.C. § 262(j) ................................................................................................................................. 4

5 U.S.C § 706(1) ..................................................................................................................22

5 U.S.C. § 553(b)(3)(A) ........................................................................................................34

5 U.S.C. § 553(d) ..................................................................................................................34

5 U.S.C. § 701(a)(2) .........................................................................................................23, 24

5 U.S.C. § 704 ........................................................................................................................17

### Rules

Federal Rule of Civil Procedure 12(b)(1)........................................................................2, 14

Federal Rule of Civil Procedure 12(b)(6)...................................................................2, 14, 17

### Regulations

21 C.F.R. § 1.94 ......................................................................................................................6

21 C.F.R. § 10.25 ................................................................................................................5, 26

21 C.F.R. § 10.25(b) .........................................................................................................26, 27

21 C.F.R. § 10.30 ...............................................................................................................5, 26

21 C.F.R. § 10.33 ...............................................................................................................6, 35

21 C.F.R. § 10.45(b) ..............................................................................................................26

21 C.F.R. § 10.75 ...............................................................................................................6, 35

21 C.F.R. § 314.105 .................................................................................................................4

21 C.F.R. § 314.200(e)(1) ......................................................................................................38

### Other Authorities

FDA, News Release, Sept. 30, 2016, *FDA warns against the use of homeopathic teething tablets and gels*, available at https://www.fda.gov/news-events/press-announcements/fda-warns-against-use-homeopathic-teething-tablets-and-gels (last visited August 16, 2020)...............................................................9

FDA/DOJ, Press Release, *Owner of New England Compounding Center Sentenced for Racketeering Leading to Nationwide Fungal Meningitis Outbreak* (June 26, 2017), available at https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/press-releases/june-26-2017-owner-new-england-compounding-center-sentenced-racketeering-leading-nationwide-fungal (last visited August 17, 2020) .10

## I.      INTRODUCTION

Plaintiff MediNatura, Inc., a company that sells homeopathic drugs, claims that Defendants violated the Administrative Procedure Act (APA) by adding MediNatura's unapproved injectable drugs to a non-binding import alert (IA 66-41 or the Import Alert) and withdrawing non-binding guidance (Compliance Policy Guide 400.400 or the CPG) that no longer reflected the Food and Drug Administration's (FDA) current enforcement priorities for homeopathic drugs. MediNatura's claims fail for several reasons. MediNatura's claims are unripe and MediNatura challenges only non-final agency action. MediNatura's claims relating to the CPG also fail because FDA's withdrawal of the CPG is not reviewable under the APA. Additionally, MediNatura lacks standing to bring Count IV because it does not request relief likely to redress its alleged injury. MediNatura also failed to exhaust administrative remedies for one of its claims. On the merits, FDA acted reasonably in adding MediNatura's unapproved injectable homeopathic drugs to IA 66-41 because these drugs are distributed in violation of the Federal Food, Drug, and Cosmetic Act (FDCA) and because of the risks of serious harm posed by unapproved injectable drugs. FDA also acted reasonably in withdrawing the non-binding guidance on homeopathic drugs as inconsistent with its current enforcement priorities. The Court should grant Defendants' Motion to Dismiss and deny MediNatura's Motion for Preliminary Injunction or, In the Alternative, Temporary Restraining Order.

Over the past several years, FDA has re-evaluated its enforcement priorities with respect to homeopathic drugs in response to the significant expansion of the homeopathic drug industry and increasing safety concerns associated with these drugs. In 2017, FDA issued draft guidance on its enforcement priorities for homeopathic drugs. Last year, FDA issued revised draft guidance and withdrew the CPG. Issued in 1988, the CPG described FDA's earlier enforcement policy regarding homeopathic drugs.

1

In June 2020, FDA issued warning letters to six companies selling unapproved homeopathic injectable products, including MediNatura. FDA advised MediNatura that its six injectable drugs were unapproved "new drugs" under the FDCA and asked the company to notify FDA of steps it had taken to correct the violations. That same month, FDA added MediNatura's injectable drugs to IA 66-41, which advises FDA field offices responsible for reviewing import entries that they "may detain without physical examination" future shipments of MediNatura's injectable drugs, and provides employees with factors to consider in deciding whether to detain in light of the facts presented by each specific shipment.

MediNatura fears that FDA may take future action to stop the sale of its unapproved homeopathic injectable drugs, either by refusing their admission into the United States or bringing an enforcement action against MediNatura. To preempt these actions, MediNatura filed this lawsuit. But instead of asking this Court to preemptively enjoin FDA's enforcement of the FDCA—a request that would undoubtedly be rejected—MediNatura adopts a different line of attack: it asks the Court to (1) enjoin FDA's withdrawal of the CPG and (2) require FDA to remove MediNatura's injectable drugs from IA 66-41.

MediNatura's lawsuit should be dismissed. First, the case is not ripe and the complaint fails to state a claim. Neither the withdrawal of the CPG nor the addition of MediNatura's injectable drugs to IA 66-41 is final agency action, dooming MediNatura's claims under both Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Moreover, MediNatura has failed to show that it will suffer immediate and significant hardship that outweighs the Court's interest in deferring review. MediNatura's claims related to the CPG should be dismissed because FDA's withdrawal of the CPG was committed to agency discretion and thus, unreviewable under the APA. MediNatura also lacks standing to bring Count IV because it has not asked for relief likely to redress its alleged injury. To the extent MediNatura alleges that FDA violated the APA by not concluding that its injectable drugs

are generally recognized as safe and effective for its intended uses (GRAS/E), such claim should be dismissed because MediNatura failed to exhaust administrative remedies.

Even if the case is not dismissed, MediNatura's motion for a preliminary injunction should be denied. MediNatura has not shown a likelihood of success on the merits because FDA complied with the APA and exercised reasoned decisionmaking when it withdrew the CPG and added MediNatura's injectable drugs to IA 66-41. Additionally, because IA 66-41 is not a legislative rule, FDA was not required to conduct notice-and-comment rulemaking. MediNatura also fails to establish that it will suffer irreparable harm absent a preliminary injunction. That MediNatura cannot recover monetary damages is insufficient to show irreparable harm, and MediNatura's allegations regarding the harm to its business are too conclusory to show that its business will be irreparably harmed without a preliminary injunction. Finally, the equities favor Defendants because the challenged actions are part of FDA's efforts to protect public safety by prioritizing enforcement against drugs that could be associated with serious risks, including unapproved homeopathic drugs. For these reasons, and as explained below, MediNatura's lawsuit should be dismissed and its Motion for Preliminary Injunction denied.

## II.    BACKGROUND

### A.    STATUTORY AND REGULATORY BACKGROUND

#### 1.    The Drug Review and Approval Process

Under the FDCA, new drugs must be approved by FDA before being introduced into interstate commerce. 21 U.S.C. § 355(a). The FDCA defines "drug" to include articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United

States, or official National Formulary. *Id.* § 321(g).[1] A drug is a "new drug" if it is not GRAS/E for

its intended uses and has not been "used to a material extent or for a material time."[2] *Id.* § 321(p).

One way for a sponsor to obtain approval of a new drug is for the sponsor to submit a new drug

application (NDA) to FDA for review, supported by full reports of clinical investigations showing

the drug to be safe and effective for its intended uses. *Id.* § 355(b).

In reviewing an NDA, FDA considers: (1) whether the drug is safe and effective for its

intended uses; (2) whether the drug's proposed labeling contains a summary of the essential

information necessary for the safe and effective use of the drug; and (3) whether the drug's

manufacturing methods and controls are adequate to preserve the drug's identity, strength, quality,

and purity. *See id.* §§ 355(c), 355(d); 21 C.F.R. § 314.105. Generally, FDA's drug approval represents

the agency's conclusion that the drug's benefits outweigh its risks based on the scientific data

presented in the NDA. *See* 21 U.S.C. § 355(d) ("[FDA] shall implement a structured risk-benefit

assessment framework to facilitate the balanced consideration of benefits and risks.").

Homeopathic drugs are "drugs" under the FDCA because they are "articles recognized in

the Homoeopathic Pharmacopoeia of the United States [HPUS]," are "intended for use in the

diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals," and/or are

---

[1] At least one of MediNatura's injectable drugs, Zeel Injection Solution, appears to be both a "biological product," as defined in 42 U.S.C. § 262(i)(1), and a "drug" as defined in 21 U.S.C. § 321(g), because it contains ingredients derived from pig cartilage, embryo, umbilical cord, and placenta. *See* Dkt. 5-2 at 570 (Pl. Ex. W at 2 (Zeel Ingredient List). Because biological products are subject to the FDCA requirements for drugs, *see* 42 U.S.C. § 262(j), FDA uses the term "drug" in this memorandum to include biological products.

[2] The definition of "new drug" includes two separate criteria, either of which is sufficient to make a product a new drug. A drug that has been used for a material time and to a material extent, but is not GRAS/E, is a new drug. Likewise, a drug that is GRAS/E, but has not been used for a material time and to a material extent, is a new drug.

"intended to affect the structure or any function of the body of man or other animals," or are component(s) of the foregoing. *Id.* § 321(g); *Meserey v. United States*, 447 F. Supp. 548, 553 (D. Nev. 1977) ("Plaintiff argues his [homeopathic] remedies are completely harmless to anyone in any condition in any dosage. This argument, even if true, will not preclude a finding that his remedies are 'drugs' within the meaning of the Act."). Accordingly, unless a homeopathic drug is not a "new drug," it must be approved by FDA before being distributed in interstate commerce.[3] *Id.* § 355(a). If the sponsor of a homeopathic drug believes its drug does not require an approved NDA prior to distribution because it is GRAS/E and has been used to a material extent and for a material time, the sponsor may submit a Citizen Petition to FDA under 21 C.F.R. §§ 10.25 and 10.30 at any time requesting that FDA agree with its determination.

### 2.      FDA's Import Program

Imported drugs must meet the requirements of the FDCA. *See* 21 U.S.C. §§ 321(b), 355, 381(a). A drug that is imported or offered for import is subject to refusal of admission if it "appears" to violate applicable FDCA requirements, including the requirement to have an approved NDA. 21 U.S.C. § 381(a). In determining whether a drug is subject to refusal of admission, FDA may consider information the agency already has, conduct a physical examination, or obtain additional information. Ex. A at 37-38 (FDA Regulatory Procedure Manual, December 2017 (RPM) § 9-8-2). But before FDA decides whether to refuse admission of a drug, it detains the drug. FDA may detain a drug without first physically examining it or taking a sample when it already has

---

[3] Certain over-the-counter (OTC) drugs may be legally distributed without an approved NDA if they meet the requirements of 21 U.S.C. § 355h, including conformity with applicable conditions for nonprescription use for the drug or class of drugs, as well as conformity with the general requirements for nonprescription drugs, including labeling requirements. Homeopathic drugs are excluded from this marketing pathway by statute. *See* Section 3853 of the CARES Act, H.R. 748 § 3853. In any case, MediNatura admits that the drugs at issue in this case are sold by prescription only. *See* Dkt. 1 at 2, 12, 17, 23 (Compl. ¶¶ 6, 44, 60-62, 94).

information that the drug appears to violate the FDCA. *Id.* This is known as a "detention without physical examination," and it may be based on many different types of information, including history of the company, product, or geographic region. *Id.* When FDA detains a drug, it issues a notice of detention advising the importer of the reasons for the detention and an opportunity for a hearing. 21 C.F.R. § 1.94. A hearing can take many forms, including telephone conversations and letters. Ex. A at 55 (RPM § 9-10-5). The importer may introduce either oral or written testimony to demonstrate the admissibility of the drug. *Id.* An FDA field office decides whether to refuse admission of detained drugs only after the importer has an opportunity to present testimony and the field office considers that testimony. *Id.* After considering any testimony, the drug will either be released, allowed to be brought into compliance with FDCA, or refused admission. *See id.* at 55, 57 (RPM § 9-10-5, 9-11-3); 21 U.S.C. § 381(a), (b). An importer may seek reconsideration of the field office's decision to refuse admission. *See* 21 C.F.R. §§ 10.33, 10.75; *see also* Ex. A at 53 (RPM § 9-10). If the drug is ultimately refused, the importer is required to either re-export or destroy the drug. *See* 21 U.S.C. § 381(a).

To assist FDA field offices in reviewing imports, FDA's Division of Import Operations (DIO) issues import alerts. Ex. A at 75 (RPM § 9-15). Import alerts allow DIO to efficiently and effectively disseminate information throughout the field and coordinate FDA's screening efforts. *See id.* at 75 (RPM § 9-15) (The purpose of import alerts is to "identify and disseminate important information (problems, violative trends, etc.)" to help ensure an "effective import coverage program."). They inform FDA field staff that FDA has evidence that supports detaining without physically examining future shipments of an imported product that appears to violate the FDCA. *See id.* at 75-76 (RPM §§ 9-15-3 & 9-15-4). When FDA determines that the conditions that gave rise to the appearance of a violation have been resolved, FDA removes the relevant products, manufacturers, or importers from an import alert. *Id.* at 44 (RPM § 9-8-15). And, in all cases,

importers whose drugs are subject to import alerts still have the opportunity described above to administratively contest the detention.

### 3. Import Alert 66-41

FDA issued IA 66-41 in 1988 to protect consumers from the risks posed by unapproved new drugs. *See* Ex. B (IA 66-41, "Detention Without Physical Examination of Unapproved New Drugs Promoted In The U.S."). It lists over 15,000 unapproved new drugs and advises FDA field offices responsible for reviewing import entries that they "may detain without physical examination" future shipments of these products, and instructs employees on how to detain products in light of the facts presented by a specific shipment. *Id.* at 3. Products, manufacturers, and importers may be added to and removed from the list as individual circumstances warrant. Requests for removal from IA 66-41 are evaluated in consultation with FDA's Center for Drug Evaluation and Research (CDER) at FDA headquarters. *See* Ex. A at 44 (RPM § 9-8-15).

### 4. FDA's Enforcement Policies Regarding Homeopathic Drugs

Homeopathy is an alternative medical practice generally based on two theories: (1) a substance that causes symptoms in a healthy person can be used in diluted form to treat symptoms and illnesses; and (2) the more diluted the substance, the more potent it is. Ex. C at 5-6 (*Drug Products Labeled as Homeopathic: Guidance for FDA Staff and Industry*, December 2017 (2017 Draft Guidance)). To date, FDA has not approved an NDA for any homeopathic drugs and has not determined that any homeopathic drugs are not "new drugs" (*i.e.*, by finding them to be GRAS/E and used for a material time and to a material extent). *See* Ex. D at 5 (*Drug Products Labeled as Homeopathic: Guidance for FDA Staff and Industry*, October 2019 (2019 Draft Guidance)). In May 1988, FDA issued CPG 400.400. Ex. E (CPG Sec. 400.400 Conditions Under Which Homeopathic Drugs May be Marketed, May 31, 1988). The CPG set forth the FDA's enforcement priorities for homeopathic drugs. It described "conditions under which homeopathic drugs may ordinarily be

marketed in the U.S.," including compliance with certain statutory and regulatory requirements

relating to ingredients, prescription status, and current good manufacturing practice (CGMP). *Id.* at

2. The CPG stated FDA would "consider[ ] for regulatory follow-up" drugs that failed to comply

with these conditions. *Id.* at 7. The CPG did not, however, purport to exempt homeopathic drugs

from statutory premarket approval requirements. While the CPG was in place, homeopathic drugs

that did not meet the statutory premarket approval requirements were distributed in violation of the

FDCA and subject to possible enforcement action.

Although the unapproved status of homeopathic drugs generally was not a top enforcement

priority for FDA in the ensuing years, FDA undertook regulatory compliance steps when

circumstances warranted. *See, e.g.*, Ex. F (Warning Letter to Newton Laboratories, Inc. (Feb. 20,

2002) (asserting unapproved new drug status for homeopathic products sold as "homeopathic

solutions to biological or chemical warfare")); Ex. G (Warning Letter to Healthy World Distributing

(May 19, 2004) (asserting unapproved new drug status for "Urbani SARS Formula Homeopathic

(6X)" and other products sold "as a natural defense and effective treatment for coronavirus

infections" during the 2002-2004 SARS epidemic)); Ex. H (Warning Letter to Matrixx Initiatives,

Inc. (June 16, 2009) asserting unapproved new drug status for Zicam homeopathic intranasal zinc

products stating that FDA determined that if the products were used as labeled, a user would receive

significant daily exposure to intranasal zinc, raising a serious safety concern)); Ex. I (Warning Letter

to Homeopathy for Health (June 8, 2010) asserting unapproved new drug status for multiple

products with claims relating to H1N1 swine flu virus)).

In early 2015, FDA announced that it was evaluating its enforcement policies for

homeopathic drugs, and invited the public to attend a hearing and submit comments on the topic.

*See Homeopathic Product Regulation: Evaluating the Food and Drug Administration's Regulatory Framework

After a Quarter-Century*, 80 Fed. Reg. 16,327-29 (March 27, 2015). FDA noted that the industry

continued to grow significantly, and it was increasingly concerned about the safety of homeopathic

products based on reports of negative health effects received through the agency's Adverse Event

Reporting System (FAERS) and the National Poison Data System. *Id.* at 16,328. When seeking

public comment, FDA reiterated that:

> [n]othing in the FD&C Act exempts drugs labeled as homeopathic from any of the requirements related to approval, adulteration, and misbranding, including labeling requirements. If a drug labeled as homeopathic is a new drug under the FD&C Act, it is subject to the same premarket approval requirements and the same standards for safety and efficacy as all new drugs.

80 Fed. Reg. at 16,327.

After FDA initiated its review, homeopathic drugs continued to raise serious safety

concerns. For example, in 2016, FDA's search of the FAERS database identified 99 cases of adverse

events consistent with belladonna (a type of plant) toxicity, including reports of infant deaths and

seizures possibly related to teething products. *See* Ex. J at 5-6 (Memorandum re Examples of Safety

Issues Associated with Homeopathic Products (Safety Memo), Oct. 22, 2019). Homeopathic infant

teething products were implicated in the majority of the cases, and FDA warned the public about

the products in September 2016. *Id.*; *see also* FDA, News Release, Sept. 30, 2016, *FDA warns against*

*the use of homeopathic teething tablets and gels*, available at https://www.fda.gov/news-events/press-

announcements/fda-warns-against-use-homeopathic-teething-tablets-and-gels (last visited August

16, 2020).

In 2017, after thoroughly considering the extensive public comments received during the

public meeting, the comments submitted to the docket, and the continuing safety concerns

associated with homeopathic products, FDA announced its intention to withdraw the CPG. *Drug*

*Products Labeled as Homeopathic; Draft Guidance for Food and Drug Administration Staff and Industry*, 82 Fed.

Reg. 60,403, 60,404 (Dec. 20, 2017). At the same time, FDA published the 2017 Draft Guidance for

public comment. *See id.*; Ex. C (2017 Draft Guidance). The 2017 Draft Guidance described a risk-

based enforcement policy, prioritizing certain categories of homeopathic products that potentially pose higher safety risk to public health. Ex. C at 5 (2017 Draft Guidance). Those riskier categories included "unapproved injectable drug products and unapproved ophthalmic drug products," which FDA explained, "pose a greater risk of harm to users due to their routes of administration (e.g., bypassing some of the body's natural defenses, differences in absorption) and the potential risk of harm from contamination."[4] Id. at 8.

After issuing the 2017 Draft Guidance, FDA received a Citizen Petition from Americans for Homeopathy Choice. Ex. K (Citizen Petition, July 25, 2018). The Petition requested that FDA, among other things, establish a regulation regarding homeopathy and continue using the CPG until the issues raised in the Petition were resolved. Id. at 2-3. The Petition argued that the industry, practitioners, and consumers had relied upon the CPG, claiming that consumers and homeopathic professionals have an interest in "continued access and use of these medicines, which the proposed Draft Guidance on homeopathy [and withdrawal of the CPG] threatens." Id. at 14.

In October 2019, FDA simultaneously: (1) issued a revised version of the 2017 Draft Guidance for public comment; (2) withdrew the CPG; and (3) responded to the Petition. In issuing the revised draft guidance, FDA:

> added a definition of "homeopathic drug product" for purposes of the guidance, added additional explanation of some of the safety issues that contributed to the

---

[4] As an example of a case that illustrates in part the serious risk that can be posed by injectable drugs, in 2012, 753 patients in 20 states were diagnosed with a fungal infection after receiving injections of preservative-free methylprednisolone acetate (MPA) manufactured by the New England Compounding Center. Of those 753 patients, the U.S. Centers for Disease Control and Prevention (CDC) reported that 64 patients in nine states died. The outbreak was the largest public health crisis ever caused by a pharmaceutical product. FDA/DOJ, Press Release, *Owner of New England Compounding Center Sentenced for Racketeering Leading to Nationwide Fungal Meningitis Outbreak* (June 26, 2017), available at https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/press-releases/june-26-2017-owner-new-england-compounding-center-sentenced-racketeering-leading-nationwide-fungal (last visited August 17, 2020).

development of the draft guidance, and clarified the intent to use risk-based factors to prioritize enforcement and regulatory actions involving homeopathic products that are marketed without required FDA approval.

See *Drug Products Labeled as Homeopathic; Draft Guidance for Food and Drug Administration Staff and Industry*, 84 Fed. Reg. 57,441, 57, 442 (Oct. 25, 2019). The 2019 Draft Guidance continued to identify injectable products as high priority. Ex. D at 5.

FDA also decided to withdraw the CPG when it issued the 2019 Draft Guidance, rather than wait for the issuance of the final guidance as it had originally planned. *Compliance Policy Guide Sec. 400.400 Conditions Under Which Homeopathic Drugs May Be Marketed; Withdrawal of Guidance*, 84 Fed. Reg. 57,439, 57,440 (Oct. 25, 2019). In doing so, FDA noted that it had encountered situations where homeopathic drugs caused or could have caused significant harm, even though they appeared to meet the conditions described in the CPG. *Id.* FDA explained that the withdrawal decision was based on four grounds: (1) homeopathic drugs are subject to the FDCA's new drug approval requirements; (2) there had been a recent growth of safety concerns regarding homeopathic drugs; (3) the homeopathic drug industry had grown significantly; and (4) the CPG "is inconsistent with the Agency's risk-based approach to enforcement generally" and "does not accurately reflect the Agency's current thinking." *Id.* FDA explained that these considerations overcame any alleged reliance interests by the homeopathic drug industry and consumers on the enforcement policy reflected in the CPG. Ex. L at 2 (FDA's Response to Citizen Petition from Americans for Homeopathy Choice, Oct. 24, 2019). FDA also stated that until the Draft Guidance is finalized, it "intends to apply its general approach to prioritizing regulatory and enforcement action, which involves a risk-based prioritization in light of all the facts of a given circumstance." Ex. D at 5 (2019

Draft Guidance).[5]

FDA recognized that withdrawing the CPG did not "represent a change in the legal obligations that apply to homeopathic drugs under the statutes FDA administers." 84 Fed. Reg. at 57,440. That is because the CPG "did not, and legally could not, provide a path for legal marketing" of homeopathic drugs. *Id.* "The CPG merely described an enforcement policy regarding homeopathic drugs." *Id.*

### B.  FACTUAL AND PROCEDURAL BACKGROUND

MediNatura manufactures, imports, and distributes OTC and prescription homeopathic drugs.[6] This lawsuit relates to MediNatura's six prescription injectable drugs: Zeel Injection Solution ("Zeel"), Traumeel Injection Solution ("Traumeel"), Engystol Injection Solution ("Engystol"), Neuralgo Rheum Injection Solution ("Neuralgo Rheum"), Lymphomyosot X Injection Solution ("Lymphomyosot X"), and Spascupreel Injection Solution ("Spascupreel"). Dkt. 1 at 2 (Compl. ¶ 6). According to MediNatura, five of these drugs are used to treat pain caused by a number of conditions, including osteoarthritis, rheumatic joint diseases, and other inflammatory and

---

[5] FDA has continued to issue warning letters regarding homeopathic products, including with respect to their status as unapproved new drugs, where the agency deemed it appropriate. *See* Ex. M (Warning Letter to King (AddictaPlex), Jan. 11, 2018); Ex. N (Warning Letter to Guna, Jan. 11, 2018); Ex. O (Warning Letter to Nutra Pharma (Nyloxin), March 11, 2019); Ex. P (Warning Letter to 8046255 Canada Inc. DBA Viatrexx, June 11, 2020), Ex. Q  (Warning Letter to Washington Homeopathic Products, Inc., June 19, 2020), Ex. R (Warning Letter to World Health Advanced Technologies Ltd., June 11, 2020), Ex. S (Warning Letter to Hevert Pharmaceuticals LLC USA, June 11, 2020), and Ex. T (Warning Letter to Homeocare Laboratories, Inc., June 22, 2020).

[6] The FDCA requires a drug to be dispensed by prescription that, "because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not safe for use except under the supervision of a practitioner licensed by law to administer such drug." 21 U.S.C. § 353(b)(1)(A). MediNatura made its own determination as to whether its unapproved new drugs should be dispensed by prescription only.  *See* Dkt. 1 at 2, 12, 17, 23 (Compl. ¶¶ 6, 44, 60-62, 94). FDA agrees that the drugs at issue in this case are prescription drugs within the meaning of the FDCA.

degenerative conditions of the musculoskeletal system, and lymphatic conditions, and Engystol is used to improve the severity and duration of symptoms in viral infections. Dkt. 5-1 at 175 (Cliff Clive Aff. ¶ 6).

FDA reviewed MediNatura's product labeling, and on June 11, 2020, FDA sent MediNatura a Warning Letter. The Warning Letter stated that MediNatura's injectable drugs are unapproved new drugs and that introducing or delivering them for introduction into interstate commerce violates 21 U.S.C. § 331. Ex. U (Warning Letter to MediNatura). The Warning Letter further stated that MediNatura "should take prompt action to correct the violations cited," that "[f]ailure to promptly correct these violations may result in legal action without further notice, including, without limitation, seizure and injunction," and that "unapproved new drugs are subject to refusal of admission into the United States," referencing IA 66-41 "for more information." *Id.* at 5. The Warning Letter also requested that MediNatura "please notify [FDA] in writing of the specific steps [MediNatura has] taken to correct violations." *Id.* On June 15, 2020, FDA added MediNatura's injectable drugs to IA 66-41. *See* Ex. B at 7 (IA 66-41).

MediNatura responded to the Warning Letter by letter dated July 1, 2020. Dkt. 7 (Pl. Ex. K, MediNatura Warning Letter Response). In its response, MediNatura made the same arguments it is now raising here. *See generally id.* FDA was in the process of reviewing and considering a response to MediNatura's letter when MediNatura filed this lawsuit and moved for a preliminary injunction.

In its Complaint, MediNatura alleges that FDA violated the APA by withdrawing the CPG and adding MediNatura's injectable drugs to IA 66-41. Specifically, Count I alleges that FDA failed to address reliance interests when it withdrew the CPG and added MediNatura's drugs to IA 66-41. Count II alleges that IA 66-41 is a legislative rule and should have been issued following notice-and-comment rulemaking. Count III alleges that FDA acted arbitrarily and capriciously in adding MediNatura's injectable drugs to IA 66-41 without adequately considering their safety. And Count

IV alleges that FDA acted arbitrarily and capriciously by failing "to consider whether homeopathic

drugs are [GRAS/E] or establish an NDA process suitable for homeopathic drugs." Dkt. 1 at 16

(Compl. ¶ 106). Although MediNatura offers various complaints about the 2019 Draft Guidance

and warning letter, its prayer for relief makes clear that the only two agency actions MediNatura

challenges are the withdrawal of the CPG and the addition of MediNatura's drugs to IA 66-41.

MediNatura has not alleged that FDA has refused admission of any of MediNatura's

injectable drugs or taken any enforcement action against MediNatura or its drugs.

## III.   STANDARD OF REVIEW

### A.    FDA'S MOTION TO DISMISS FOR LACK OF JURISDICTION

A plaintiff bears the burden of establishing that a court has subject-matter jurisdiction over

its claims, and failure to carry that burden compels dismissal under Rule 12(b)(1). *In re Domestic

Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 55 (D.D.C. 2016). A court cannot exercise subject-

matter jurisdiction where the plaintiff lacks standing to bring its claim or the claim is not yet ripe for

adjudication. *See, e.g.*, *Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1206-07 (D.C. Cir. 2013); *Nat'l

Ass'n of Home Builders v. Envtl. Prot. Agency*, 667 F.3d 6, 11 (D.C. Cir. 2011). "The court is not limited to

the allegations of the complaint," and "may consider such matters outside the pleadings as it deems

appropriate to resolve the question of whether it has jurisdiction to hear the case." *Competitive Enter.

Inst. v. Envtl. Prot. Agency*, 153 F. Supp. 3d 376, 381-82 (D.D.C. 2016) (internal quotation marks and

citations omitted).

Under Rule 12(b)(6), a complaint must be dismissed if it fails to state a claim upon which

relief can be granted. In evaluating the claim for relief, the Court need not "accept as true a legal

conclusion couched as a factual allegation." *Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524,

538 (D.C. Cir. 2015) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In assessing a

Rule 12(b)(6) motion, the Court "may consider the facts alleged in the complaint, documents

attached thereto or incorporated therein, and matters of which it may take judicial notice." *Abhe v. Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007) (quotation omitted).

### B. MEDINATURA'S MOTION FOR A PRELIMINARY INJUNCTION

To meet the heightened standard for obtaining a preliminary injunction, the movant "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[7] "In this context, the 'merits' on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction." *Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015) (quoting *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 328 (D.C. Cir. 1987) (Williams, J., concurring and dissenting)). "A preliminary injunction is an extraordinary remedy never awarded as of right," *Winter*, 555 U.S. at 7, but "only when the party seeking relief, by a clear showing, carries the burden of persuasion," *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).

### IV. ARGUMENT

MediNatura's challenge to non-final, non-binding agency actions fails for several reasons: MediNatura's claims are unripe and MediNatura lacks a cause of action to challenge non-final agency action. Each of these grounds independently warrants dismissal of MediNatura's complaint and denial of its motion for a preliminary injunction without reaching the merits of MediNatura's claims. MediNatura's claims related to the CPG should be dismissed because FDA's withdrawal of

---

[7] Before the Supreme Court's *Winter* decision, courts in this Circuit used a "sliding scale" approach under which "a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). "[R]egardless of whether the sliding scale approach [still] applies . . . a party who fails to show a substantial likelihood of success is not entitled to a preliminary injunction." *Cal. Ass'n of Private Postsecondary Sch. v. DeVos*, 344 F. Supp. 3d 158, 167 (D.D.C. 2018) (quotation omitted). In addition, irreparable harm is a standalone factor post-*Winter*. *Id.*

the CPG is not reviewable under the APA. MediNatura also lacks standing to raise Count IV

because it has not requested relief that would likely redress its alleged injury. Additionally, to the

extent MediNatura alleges that FDA violated the APA by not concluding that its injectable drugs are

GRAS/E, dismissal of such claim is warranted by MediNatura's failure to exhaust available

administrative processes. Finally, even if the Court were to reach the merits, MediNatura's claims fail

because FDA reasonably exercised its expertise and discretion and followed all required procedures

in adding MediNatura's unapproved injectable drugs to IA 66-41 and in withdrawing guidance that

FDA believed no longer reflected its enforcement priorities and did not adequately protect public

health.

### A.    THE COURT SHOULD DISMISS MEDINATURA'S COMPLAINT

#### 1.    MediNatura's Claims Are Not Ripe and Fail to State a Claim

MediNatura's claims must be dismissed because they are not ripe and MediNatura fails to

state a claim under the APA. "Ripeness is a justiciability doctrine designed to 'prevent the courts,

through avoidance of premature adjudication, from entangling themselves in abstract disagreements

over administrative policies, and also to protect the agencies from judicial interference until an

administrative decision has been formalized and its effects felt in a concrete way by the challenging

parties.'" *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (quoting *Abbott Labs.*

*v. Gardner*, 387 U.S. 136, 148-49 (1967)). To determine whether a dispute is ripe, a reviewing court

must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of

withholding court consideration." *Abbott Labs.*, 387 U.S. at 149; *see also Nevada v. Dep't of Energy*, 457

F.3d 78, 84 (D.C. Cir. 2006) (citing *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)).

MediNatura's claims fail both parts of this test. MediNatura's claims also must be dismissed because,

by challenging only non-final agency action, they fail to state a claim under the APA.

       **a.**    **MediNatura's Claims Are Unripe and Its Complaint Fails to State a Claim Because MediNatura Does Not Challenge Final Agency Action or Reviewable Lack of Action**

MediNatura's challenge to non-final agency actions is unripe and fails to state a claim for the same reason: lack of finality. A challenge to an agency action under the APA "is not fit," and therefore not ripe, "if it does not involve final agency action." *Holistic Candlers & Consumers Ass'n v. Food & Drug Admin.*, 664 F.3d 940, 943 n.4 (D.C. Cir. 2012); *see* 5 U.S.C. § 704 (limiting judicial review to "final" agency action for which there is no other adequate remedy in court). By the same token, except for certain circumstances not relevant here, the APA provides a cause of action to challenge only "final agency action." 5 U.S.C. § 704; *see Hormel Foods Corp. v. U.S. Dep't of Agric.*, 808 F. Supp. 2d 234, 242 (D.D.C. 2011) ("[A] motion to dismiss claims asserted under the APA on the grounds that there is no final agency action . . . is appropriately brought by a defendant under Federal Rule of Civil Procedure 12(b)(6)[.]"). Limiting challenges to "final" agency action "conserves both judicial and administrative resources to allow the required agency deliberative process to take place before judicial review is undertaken." *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 733 (D.C. Cir. 2003); *see, e.g., Am. Petroleum Inst. v. Envtl. Prot. Agency*, 683 F.3d 382, 387 (D.C. Cir. 2012) (noting that the fitness requirement "is primarily meant to protect the agency's interest in crystallizing its policy before that policy is subjected to judicial review and the court's interest in avoiding unnecessary adjudication" (quoting *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 49 (D.C. Cir. 1999)).

MediNatura has not alleged, nor could it, that FDA has taken final agency action reviewable under the APA. To be "final," agency action must: (1) "mark the 'consummation' of the agency's decisionmaking process," rather than be "tentative" or "interlocutory," and (2) be an action by which "rights or obligations have been determined or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78, (1997). "Agency action is final when it 'imposes an obligation,

denies a right, or fixes some legal relationship.'" *Action on Smoking & Health v. Dep't of Labor*, 28 F.3d 162, 165 (D.C. Cir. 1994) (quoting *Nat. Res. Def. Council, Inc. v. U.S. Nuclear Regulatory Comm'n*, 680 F.2d 810, 815 (D.C. Cir. 1982)). The agency actions MediNatura challenges—FDA's withdrawal of the CPG, addition of MediNatura's injectable drugs to IA 66-41, and failure to establish a discrete approval process for homeopathic drugs—do not meet this standard. Dkt. 1 at 19-16 (Compl. ¶¶ 72-106).

### i.     FDA's withdrawal of CPG 400.400 was not final agency action

FDA's withdrawal of the CPG was not final agency action because it did not determine rights or obligations, and legal consequences did not flow from it. *See Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016) (agency action "must satisfy both prongs of the *Bennett* test to be considered final"). Just as *issuing* a non-binding policy statement is not final agency action, *withdrawing* a non-binding policy statement is not final agency action either. *See, e.g.*, *Pharm. Research & Manufs. of Am. v. U.S. Dep't of Health & Human Servs.*, 138 F. Supp. 3d 31, 41 (D.D.C. 2015) ("[I]nterpretative rules, guidance policies, and other general agency statements that lack the force of law 'generally do not qualify' as a final agency action.") (quoting *Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.*, 738 F.3d 387, 395 (D.C. Cir. 2013)); *Lystn, LLC v. Food & Drug Admin.*, 10-cv-01943, 2020 WL 248962, at *4 (D. Co. Jan. 16, 2020) (holding that an FDA Compliance Policy Guide was not final agency action because FDA "derives no enforcement authority from the CPG").

Prior to its withdrawal, the CPG was a non-binding policy statement that publicly described the Agency's enforcement priorities for homeopathic drugs. Ex. E (CPG); 84 Fed. Reg. at 57,440 (2019). Specifically, it stated that FDA would "consider[ ] for regulatory follow-up" homeopathic drugs that failed to comply with specified statutory and regulatory requirements pertaining to

labeling, ingredients, prescription status, and current good manufacturing practice. *See id.* It did not

impose any new obligations or confer any new rights. *Id.* In particular, it did not purport to exempt

homeopathic drugs from statutory premarket approval requirements. *Id.* ("CPG 400.400 did not,

and legally could not, provide a path for legal marketing of unapproved new drugs, including those

that are homeopathic."). Nor could it. As FDA explained in its notice of withdrawal of the CPG,

"[t]he Agency does not have authority to exempt a product or class of products that are new drugs

under the [FDCA] from the new drug approval requirements of the [FDCA.]." *Id.*

Because the CPG did not alter any legal requirements applicable to homeopathic drugs,

"withdrawing the CPG d[id] not represent a change in the legal obligations that apply to

homeopathic drugs under the statutes FDA administers." *Id.* Accordingly, FDA's authority to

enforce the FDCA against the unlawful distribution of homeopathic drugs did not change with

CPG's withdrawal. Because the CPG's withdrawal affects no rights or obligations and has no legal

consequences, it does not constitute final agency action.

> ### ii.      FDA's addition of MediNatura's injectable drugs to IA 66-41 was not final agency action

FDA's addition of MediNatura's injectable drugs to IA-66-41 fails both prongs of the *Bennett*

test: it did not represent the consummation of FDA's decisionmaking process, and it did not

determine MediNatura's rights or obligations or have legal consequences. 520 U.S. at 177-78.

Rather, IA 66-41 provides non-binding guidance to FDA field offices regarding how they may

perform the interlocutory task of determining what products to detain pending a final determination

of whether to refuse admission into the country. Ex. B (IA 66-41). By its terms, IA 66-41 "does not

operate to bind the FDA"; it merely tells FDA field offices what they "should" do. *Id.* at 2. And

even if IA 66-41 was binding on FDA field offices, the decision to detain is but an interlocutory step

towards the decision of whether to admit the drugs. Before FDA would reach a final decision to

refuse admission of any detained drugs, FDA would give MediNatura notice of the detention and an opportunity to be heard, MediNatura would have a chance to present evidence and arguments to challenge the appearance of a violation, and, finally, FDA would evaluate MediNatura's evidence and arguments and decide whether to refuse admission of its detained injectable drugs. *See, e.g.*, *Perez v. Nidek Co.*, 711 F.3d 1109, 1120 (9th Cir. 2013) ("The FDA knew about the allegations that the [product] was being used for unapproved hyperopic use and took steps to address the allegations by issuing warning letters and an Import Alert, but it did not take final action against the defendants."). Only after the occurrence of each of these steps would there potentially be a consummation of the Agency's decisionmaking process.[8] Here, however, MediNatura has not even alleged that its injectable drugs have been detained.

FDA's listing of MediNatura's products on IA 66-41 also did not determine MediNatura's rights or obligations or have legal consequences. IA 66-41 merely advises FDA field offices regarding evidence of the appearance of a violation and identifies products that field employees *may* detain. *Id.* By its terms, "[i]t does not create or confer any rights for or on any person, and does not operate to bind FDA or the public." *Id.* at 2; *see Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014) (holding that guidance was not a final agency action where it expressly stated that it did "not impose legally binding requirements"). Moreover, to the extent IA 66-41 increases the likelihood of detention and thereby extends the period in which FDA determines whether to refuse admission, that sort of administrative burden is not a cognizable "legal consequence" for purposes

---

[8] This would still be the case if a shipment of MediNatura's products were offered for import and detained while MediNatura's Motion for Preliminary Injunction is pending. Detention is merely an interim step, which leads to a hearing, and then a determination regarding admissibility. *See* RPM § 9-10.

of finality.[9] *See, e.g.*, *Versata Dev. Corp. v. Rea*, 959 F. Supp. 2d 912, 915 (E.D. Va. 2013) (holding that

Patent Trial and Appeal Board's decision to institute post-grant review was "merely an initial step in

the PTAB's process to resolve the ultimate question of patent validity, not final agency action");

*Royster-Clark Agribusiness, Inc. v. Johnson*, 391 F. Supp. 2d 21, 27-28 (D.D.C. 2005) (holding that EPA

issuance of a notice of violation was not a final agency action because it was "a first step in a

potential enforcement process" and "it merely notifie[d] plaintiffs of their existing obligations"

under the Clean Air Act). Thus, MediNatura's claims arising from IA 66-41 should be dismissed.[10]

### iii.  MediNatura does not allege that FDA failed to take a discrete action it was required to take

Count IV requires a slightly different analysis because it challenges agency *in*action. In this

claim, MediNatura faults FDA for not creating "an NDA process or a process for determining

which homeopathic drugs are [GRAS/E] that would take into account information from experts in

the homeopathic community about the safety and effectiveness of homeopathic products." Dkt. 1 at

---

[9] MediNatura does not allege that the warning letter—issued just a few days before FDA added MediNatura's injectable drugs to IA 66-41—is a final agency action subject to judicial review; nor could it, because "FDA's warning letters . . . neither mark the consummation of the agency's decisionmaking process nor determine the [regulated party's] legal rights or obligations." *Holistic Candlers & Consumers Ass'n*, 664 F.3d at 943.

[10] MediNatura asks the Court to preliminarily enjoin "enforcement" of IA 66-41 with respect to MediNatura's products. To the extent MediNatura's request is construed as a request to preemptively enjoin FDA from enforcing the FDCA by refusing admission of MediNatura's unapproved drugs and/or initiating enforcement proceedings, such request should be rejected. It has long been established that courts lack jurisdiction to enjoin FDA from initiating enforcement proceedings under the FDCA. *See Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 600-02 (1950); *see also Southeastern Minerals, Inc. v. Harris*, 622 F.2d 758, 764 (5th Cir. 1980) (holding that pre-enforcement review of FDA's determination that probable cause existed to seize and initiate enforcement proceedings was clearly proscribed by *Ewing*); *Direct Mktg. Concepts, Inc. v. Fed. Trade Comm'n*, 581 F. Supp. 2d 115, 117(D. Mass. 2008) ("It is well-established that it is improper for a district court to entertain a request for injunctive relief that would have the effect of enjoining ongoing enforcement action.").

15-16 (Compl. ¶ 103). Yet, even setting aside MediNatura's failure to seek relief capable of redressing this claim, *see infra* at 25, this claim does not challenge final agency action or allege that FDA failed to take legally required action. When a party challenges an agency's "failure to act," it must identify an action the agency was "legally *required*" to take but did not. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004) (explaining that "[t]his limitation appears in § 706(1)'s authorization for courts to 'compel agency action *unlawfully* withheld'" (quoting 5 U.S.C § 706(1))). But MediNatura identifies no such action. It does not, and cannot, allege that FDA has a discrete duty to create a new NDA or GRAS/E process for homeopathic drugs because no such duty exists. Congress, not FDA, created the current NDA review process and the definition of "new drug" of which MediNatura complains, and therefore only Congress could create such a new process as MediNatura envisions. 21 U.S.C. §§ 355, 321(p). This is precisely the kind of "broad programmatic attack" that falls outside the scope of the APA.[11] *Id.* Because none of MediNatura's four claims challenge either final agency action or failure to take an action that the agency was required to take, the Court should dismiss the Complaint and deny MediNatura's Motion.

> **b.    MediNatura Has Not Alleged that It Will Suffer Immediate and Significant Hardship Sufficient to Outweigh the Interest in Deferring Review**

MediNatura's claims also are not ripe because it has failed to allege that it will suffer immediate and significant hardship sufficient to "outweigh institutional interests in the deferral of review." *Devia,* 492 F.3d 421, 427 (D.C. Cir. 2007). In fact, MediNatura has not suffered any hardship. Rather, MediNatura alleges that its six injectable drugs account for 41 percent of its

---

[11] To hide this obvious infirmity, MediNatura styles this claim under 21 U.S.C. § 706(2)(A), as the agency being "arbitrary and capricious," and under 21 U.S.C. § 706(2)(C), as the agency acting inconsistently with the statutory definition of "drug," 21 U.S.C. § 321(p)(1). *See* Dkt. 1 at 26 (Compl. ¶ 106). But MediNatura also cites 21 U.S.C. § 706 generally, recognizing that it is actually attempting to allege "agency action unlawfully withheld" under 21 U.S.C. § 706(1). *Id.*

revenue; it only has a small inventory of its injectable drugs; and it will "soon" have none to distribute or sell. Dkt. 1 at 17-18 (Compl.¶¶ 63-64). According to MediNatura's original estimate, it expected to run out of four of the drugs in August and the other two in October. Dkt. 5-2 at 179 (Cliff Clive Aff. ¶ 24). But, as explained above, many contingencies still must come to pass before FDA makes any final decision affecting these drugs. And, to the extent MediNatura experiences hardship in the future between the time its drugs are detained (if they are detained) and the time the Agency makes a final decision to refuse them admission (if FDA makes that decision), the hardship of being required to participate in FDA's administrative process with respect to its imports does not outweigh the interests in deferring review. *See Nevada*, 457 F.3d at 86 ("[R]equiring a party to participate in further administrative or judicial proceedings is not a hardship sufficient to outweigh a determination that an issue is unfit for review.") (quoting *Nuclear Energy Inst.*, *Inc. v. Envtl. Prot. Agency*, 373 F.3d 1251, 1313 (D.C. Cir. 2004)). Indeed, in nearly every case where FDA reviews an application or request, there will be a time delay. That time-lag is an unavoidable part of the administrative review process and does not constitute substantial hardship.

### 2.     FDA's Withdrawal of the CPG Is Not Reviewable Under the APA

MediNatura's challenges to the CPG's withdrawal also must be dismissed because FDA's decision to withdraw the CPG is an unreviewable action "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). In *Heckler v. Chaney*, 470 U.S. 821, 831 (1985), the Supreme Court held that Section 701(a)(2) of the APA precludes review of FDA's decision not to institute an enforcement action. The Court observed that the decision not to enforce "often involves a complicated balancing of a number of factors which are peculiarly within FDA's expertise," including "whether agency resources are best spent on this violation or another" and whether enforcement in a particular scenario "best fits the agency's overall policies." *Id.* at 831. The Court also recognized that agency enforcement discretion "shares to some extent the characteristics of the decision of a prosecutor in

the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch." *Id.* at 832.

FDA's setting of enforcement priorities is unreviewable for the same reasons *Heckler* held that individual non-enforcement decisions are unreviewable. Both the CPG and the withdrawal of the CPG in favor of a risk-based approach involve choices of which FDCA violations to prioritize, and those choices rest on a "complicated balancing" of factors within FDA's expertise, including determining how the agency's resources are best spent in light of its overall priorities. *Id.* at 831. Furthermore, FDA's decision to withdraw an enforcement policy is akin to changes in policy as to criminal prosecutorial discretion. *See id.* at 832. Thus, FDA's withdrawal of the CPG was "committed to agency discretion" by law and not reviewable under the APA. 5 U.S.C. § 701(a)(2).

Contrary to MediNatura's suggestion, Dkt. 5-1 at 24 (Pl. Mem.), the Supreme Court's decision in *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020), does not require a different conclusion. That decision reaffirmed *Heckler* but found it inapplicable to the agency action at issue—the rescission of the Deferred Action for Childhood Arrivals (DACA) program— because the DACA program was "not simply a non-enforcement policy." *Id.* at 1906. Rather, DACA "created a program for conferring affirmative immigration relief" involving a process "for identifying individuals who met the [program's] enumerated criteria," reviewing them under a "standardized review process," and sending them "formal notices indicating whether the alien would receive the two-year forbearance." *Id.* DACA also provided "benefits attendant" to the program, including the ability to request work authorization and eligibility for Social Security and Medicare. *Id.* at 1906. The Court concluded that "[b]ecause the DACA program is more than a non-enforcement policy, its rescission is subject to review under the APA." *Id.* at 1907.

MediNatura is thus mistaken to read *Regents* as changing the basic principle that agency enforcement discretion policies are unreviewable. At most, *Regents* holds that the rescission of

programs conferring affirmative benefits may be reviewable—a holding that is plainly inapplicable here. Unlike the DACA program, the CPG created no program for conferring affirmative relief on the homeopathic drug industry. FDA did not provide formal notices to companies such as MediNatura stating that they would not face enforcement action. Nor did the CPG provide any "benefits attendant" to the policy. Rather, the CPG simply set forth the FDA's enforcement priorities for homeopathic drugs and described which types of violations FDA planned to "consider[] for regulatory follow-up." Ex. E at 7 (CPG). Accordingly, unlike the rescission of the DACA program, FDA's withdrawal of the CPG was committed to agency discretion by law and is not reviewable under the APA.

### 3. MediNatura Lacks Standing to Bring Count IV

MediNatura's Count IV should be dismissed for another reason: MediNatura does not have standing to bring this Count. "One element of the [Article III] case-or-controversy requirement is that plaintiffs must establish that they have standing to sue." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). To establish standing, a plaintiff must show it has: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

Count IV challenges FDA's "failure to consider whether homeopathic drugs are [GRAS/E] or establish an NDA process suitable for homeopathic drugs." Dkt. 1 at 26 (Compl. ¶ 106). MediNatura, however, does not ask this Court for relief that would likely redress this alleged injury. MediNatura asks the Court to vacate the withdrawal of the CPG and vacate the addition of its injectable drugs to IA 66-41. It does not request that the Court require FDA to consider whether homeopathic drugs in general, or MediNatura's injectable drugs in particular, are GRAS/E or establish a new NDA process. Thus, even if the Court awarded MediNatura the relief it seeks, MediNatura would still not have a decision from FDA regarding whether homeopathic drugs are

GRAS/E or a new NDA process for homeopathic drugs. For this additional reason, MediNatura

does not have standing to bring Count IV.

        **4.**      **To the Extent MediNatura's Complaint Could Be Interpreted to Allege that FDA Acted Arbitrarily and Capriciously By Not Determining that Its Injectable Drugs Are GRAS/E, MediNatura Has Not Exhausted Its Administrative Remedies**

To the extent MediNatura's Complaint could be construed as alleging that FDA violated the

APA by not determining that MediNatura's injectable drugs are GRAS/E, such a claim should be

dismissed because MediNatura has not exhausted its administrative remedies.[12] Specifically,

MediNatura did not file a citizen petition requesting that FDA determine whether its injectable

drugs are GRAS/E. 21 C.F.R. §§ 10.25, 10.30 (outlining requirements for filing a citizen petition).

Under FDA regulations, a party must first use the citizen-petition process to "request that the

Commissioner take or refrain from taking any form of administrative action," and that request must

"be the subject of a final administrative decision based on [the citizen petition] . . . before any legal

action is filed in a court." 21 C.F.R. § 10.45(b).

The Court's interest in requiring a party to exhaust its administrative remedies before filing

suit is particularly strong in a situation like this, where FDA has primary jurisdiction to determine

whether a drug is a "new drug" as defined by the FDCA. *Weinberger v. Hynson, Westcott & Dunning,

Inc.*, 412 U.S. 609, 627 (1973); *see also* 21 C.F.R. § 10.25(b) ("FDA has primary jurisdiction to make

the initial determination on issues within its statutory mandate . . ."). Indeed, FDA's regulations

---

[12] This Court should not construe the Complaint as alleging such a claim. While MediNatura alleges that there is "strong evidence" that its injectable drugs are GRAS/E and that FDA has made no effort to determine whether its injectable drugs are GRAS/E, *see* Dkt. 1 at 26 (Compl. ¶¶ 104-105), MediNatura does not ask the Court to make a GRAS/E determination or to require FDA to find that its injectable drugs are GRAS/E.

recognize that it will request that a court dismiss "any issue [over which FDA has primary jurisdiction] which has not previously been determined by the agency." 21 C.F.R. § 10.25(b).

"The [exhaustion of administrative remedies] doctrine provides 'that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.'" *McKart v. United States*, 395 U.S. 185, 193 (1969) (quoting *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50-51 (1938)). The purpose of the exhaustion requirement is to "avoid[] [the] premature interruption of the administrative process . . . to let the agency develop the necessary factual background upon which decisions should be based, [a]nd since agency decisions are frequently of a discretionary nature or frequently require expertise, the agency should be given the first chance to exercise that discretion or to apply that expertise." *Id.* at 193-94. The exhaustion requirement also promotes judicial efficiency because the agency may decide the matter in favor of the plaintiff and obviate the need for judicial review. *Id.* at 195.

Here, where MediNatura has not even attempted to raise the GRAS/E standard with the Agency through the citizen petition process, the exhaustion doctrine applies with particular force. As the D.C. Circuit explained, the exhaustion rule "is especially important where allowing the litigants to proceed in federal court would deprive the agency of any opportunity to exercise its discretion or apply its expertise." *Ass'n of Flight Attendants-CWA, AFL-CIO v. Chao*, 493 F.3d 155, 159 (D.C. Cir. 2007); *see also Nat'l Gay Rights Advocates v. HHS*, No. 87-1735, 1988 WL 43833, at *1-7 (D.D.C. Apr. 26, 1988) (dismissing complaint as premature for failure to file a citizen petition); *Garlic v. U.S. Food & Drug Admin.*, 783 F. Supp. 4 (D.D.C. 1992), *appeal dismissed*, 986 F.2d 546 (D.C. Cir. 1993).

Requiring MediNatura to submit a citizen petition to FDA before seeking judicial review would allow FDA to consider and address MediNatura's concerns about FDA's evaluation of the scientific evidence relating to its drugs and would crystalize the issues in contention. Because exhaustion of administrative remedies would promote judicial economy and aid judicial review (if

any) in this case, MediNatura should be precluded from seeking judicial review of its GRAS/E claim (to the extent the Court finds that MediNatura has alleged such a claim) until after it presents its claims and contentions to the Agency.

In sum, this Court should dismiss MediNatura's complaint because its claims are not ripe, its claims related to the CPG are not reviewable under the APA, it lacks standing to bring Count IV, and it has failed to exhaust administrative remedies with respect to any potential claim that FDA acted arbitrarily and capriciously by not determining that its injectable drugs are GRAS/E.

## B.   THE COURT SHOULD DENY MEDINATURA'S MOTION FOR A PRELIMINARY INJUNCTION

Even if MediNatura's Complaint survives dismissal, MediNatura fails to meet the heightened standard for obtaining a preliminary injunction. As discussed above, MediNatura has not shown that it is likely to succeed in establishing jurisdiction. Nor has MediNatura shown a likelihood of success on the merits of its claims. FDA acted reasonably in withdrawing the CPG and adding MediNatura's injectable drugs to IA 66-41. FDA was not required to consider MedNatura's alleged reliance interests, but even if it were, FDA did so. FDA also was not required to conduct notice-and-comment rulemaking with respect to the alert. Moreover, FDA was not required to determine that MediNatura's injectable drugs are GRAS/E because these drugs clearly fail to meet the GRAS/E standard. MediNatura also has not shown that it is likely to suffer irreparable harm in the absence of a preliminary injunction. Its allegations of irreparable harm are too conclusory, and the fact that MediNatura cannot obtain monetary relief from FDA does not render its harm irreparable. Finally, the balance of equities clearly tips in the Defendants' favor. The actions being challenged here are part of FDA's efforts to prioritize enforcement of the FDCA in a manner that protects the public.

### 1.   MediNatura Has Failed to Show It Is Likely to Succeed on the Merits of Its Claims that FDA Violated the APA by Acting Arbitrarily and

**Capriciously and Failing to Conduct Notice-and-Comment Rulemaking**

    a.    **FDA Was Not Required to Consider MediNatura's Alleged Reliance Interests and Even If It Were, FDA Adequately Considered Such Alleged Interests**

In Count I of its Complaint, MediNatura alleges that FDA arbitrarily and capriciously withdrew the CPG because it "changed the regulatory scheme for . . . the homeopathic drug industry" but "[did] not make any attempt to address the reliance interests of the homeopathic drug manufacturers and marketers, medical practitioners, or patients . . . [or] acknowledge those reliance interests in any way" when it withdrew the CPG. Dkt. 1 at 20 (Compl. ¶¶ 76-78). As discussed, *see supra* at 23-25, FDA's withdrawal of the CPG is not reviewable under the APA, and therefore, the Court need not reach the issue of whether FDA adequately considered reliance interests.

Even if MediNatura's claim were reviewable, it is not likely to succeed on the merits. To begin with, FDA was not required to consider MediNatura's alleged reliance interests because they were not reasonably incurred. *See Solenex, LLC v. Bernhardt*, 962 F.3d 520, 529 (D.C. Cir. 2020) (rejecting argument that Department of Interior failed to adequately consider reliance interests where the party failed to identify any reliance interests reasonably incurred). MediNatura's reliance argument seems to be premised on the understanding that the CPG permitted MediNatura to distribute its unapproved injectable drugs in violation of the FDCA, and that it built its business on that understanding. As explained earlier, that is simply wrong; the CPG did not exempt MediNatura from the FDCA's premarket approval requirements. *See supra* at 7-12.

Moreover, the relevant statutory text has not changed since 1938, and FDA has made repeated public statements that homeopathic drugs are subject to the statute's premarket approval requirements since at least 2009. *See* 80 Fed. Reg. at 16,327 (2015); 82 Fed. Reg. at 60,404 (2017); 84 Fed. Reg. at 57,440-41 (2019); 84 Fed. Reg. 57,442 (2019); Ex. C at 3 (2017 Draft Guidance); Ex. D

at 3 (2019 Draft Guidance); Ex. L at 3, 5, 6-14, 15 (FDA Citizen Petition Response). Over many

years before FDA issued the Warning Letter to MediNatura, FDA issued many warning letters with

regard to the unapproved new drug status of other homeopathic drugs. *See, e.g.,* Ex. F (Warning

Letter to Newton); Ex. G (Warning Letter to Health World Distributing); Ex. H (Warning Letter to

Matrixx Initiatives); Ex. I (Warning Letter to Homeopathy for Health); Ex. M (Warning Letter to

King Bio Inc.); Ex. N (Warning Letter to Guna Inc.); Ex. O (Warning Letter to Nutra Pharma).

MediNatura's corporate predecessor even submitted a public comment to the docket for the 2017

Draft Guidance. Ex. V (Heel Comment); Dkt. 1 at 9 (Compl. ¶ 33) (describing relationship to Heel).

MediNatura has been, or reasonably should have been, aware for years of FDA's view of the

application of the FDCA to homeopathic drugs. Moreover, the 2017 and 2019 Draft Guidances,

although not final, clearly articulated FDA's concern regarding injectable drugs, noting that they

pose a greater risk of harm to consumers. Ex. C (2017 Draft Guidance); Ex. D (2019 Draft

Guidance).

   In the event that the Court considers MediNatura's reliance interests to be reasonably

incurred, FDA adequately considered those interests. At the time it withdrew the CPG, FDA

provided a "reasoned explanation," in writing, in public documents. *Fed. Commc'ns Comm'n v. Fox

Television Stations, Inc.,* 556 U.S. 502, 515 (2009); *accord Encino Motorcars, LLC v. Navarro*, 136 S.Ct.

2117, 2125-26 (2016). Specifically, FDA explained why there was substantial justification for FDA's

decision to withdraw the CPG. 84 Fed. Reg. at 57,440-41 (2019). *See also* Ex. L at 15-19 (Petition

Response). Additionally, in its response to the Citizen Petition from Americans for Homeopathy

Choice—issued simultaneously with FDA's announcement of the withdrawal of the CPG—FDA

responded to Americans for Homeopathy Choice's argument that various entities relied on the

CPG. Ex. L at 15 (Petition Response). FDA stated that "[t]o the extent that homeopathic

professionals (including industry) or consumers may have relied on" the CPG, its withdrawal did not

represent a change in the legal status of homeopathic drugs. FDA further explained that four factors, taken together, outweighed the asserted reliance interests: (1) that the FDCA and Public Health Service Act include premarket review and approval requirements from which homeopathic drugs are not exempt (absent a determination that a homeopathic drug is not a "new drug" under 21 U.S.C. § 321(p)); (2) the recent growth of safety concerns associated with homeopathic drugs, including concerns regarding products associated with serious adverse events and otherwise presenting significant safety risks and egregious violations of CGMP requirements,[13] (3) the continued expansion of the homeopathic industry since issuance of the CPG, resulting in an increasing number of consumer exposures; and (4) the agency's interest in its general risk-based approach to enforcement. Ex. L at 15-16 (Petition Response); *see also* 84 Fed. Reg. at 57,440-41.

Under *Regents*, an agency need only acknowledge the existence of reliance interests, determine their significance, and weigh them against competing policy concerns. 140 S. Ct. 1891 at 1915. As just explained, FDA did all of that here. Moreover, an agency need not "consider all policy alternatives" or explore every "thought conceivable by the mind of man." *Id.* It follows *a fortiori* that an agency need not consider policy alternatives that are beyond the scope of the agency's authority to implement in the first place. It certainly follows that agencies are not required to consider alternatives beyond the scope of their authority. But that is what MediNatura complains of here: that FDA failed to consider a method for accommodating its reliance interests (creating a drug approval process or GRAS/E standard that is an "alternative" to the statutorily created NDA process) that is outside FDA's statutory authority. *See also infra* at 36-37. As explained, absent a finding that a specific drug is GRAS/E (and has been used to a material extent and for a material time), homeopathic drugs are "new drugs." FDA does not have authority to exempt a product or class of products that

---

[13] FDA documented these concerns in a detailed memorandum. *See* Ex. J (Safety Memo).

are new drugs from the new-drug-approval requirements of the FDCA. *See Cutler v. Kennedy*, 475 F. Supp. 838, 856 (D.D.C. 1979) (FDA may not lawfully exempt a category of unapproved new drugs from enforcement action); *see also Util. Air Regulatory Grp. v. Envtl. Prot. Agency*, 573 U.S. 302, 327 (2014) ("An agency confronting resource constraints may change its own conduct, but it cannot change the law."). FDA explained this in the Federal Register Notice withdrawing the CPG, 84 Fed. Reg. at 57,440-1, and in the Citizen Petition response.[14] Ex. L at 6.

For these reasons, MediNatura has not shown that it is likely to succeed on the merits of its claim that FDA violated the APA by failing to consider its reliance interests.

>   **b.** **FDA's Addition of MediNatura's Unapproved Injectable Drugs to IA 66-41 Was Not Arbitrary or Capricious**

In Count III, MediNatura contends that FDA's addition of MediNatura's injectable drugs to IA 66-41 was arbitrary and capricious because FDA failed to adequately consider the safety of those drugs. Assuming, *arguendo*, that the Court considers IA 66-41 final agency action capable of judicial review, FDA's decision to add MediNatura's injectable drugs to the import alert easily clears the arbitrary and capricious standard. *See* 5 U.S.C. § 706(2)(A). The Court's scope of review is narrow; it determines "only whether the [Agency] examined the relevant data and articulated a satisfactory explanation" for the decision, "including a rational connection between the facts found and the choice made." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019) (quoting *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). "The question is not what [the court] would have done, nor whether [the court] agree[s] with the agency action. Rather,

---

[14] MediNatura is also incorrect to suggest that FDA's deferral of homeopathic drugs, as a class, from FDA's pre-CARES Act process for reviewing OTC drugs is relevant here. As discussed in footnote 4, the CARES Act excludes homeopathic drugs from the new 21 U.S.C. § 355h pathway that allows distribution of OTC drugs without an approved NDA under certain conditions. Moreover, as explained above, the parties agree that the drugs at issue in this case are prescription drugs.

the question is whether the agency action was reasonable and reasonably explained." *Jackson v. Mabus*, 808 F.3d 933, 936 (D.C. Cir. 2015).

In adding MediNatura's injectable drugs to IA 66-41, FDA considered the fact that the agency has evidence that the drugs are unapproved new drugs introduced, or delivered for introduction, into interstate commerce in violation of the FDCA. 21 U.S.C. § 331(d). This alone suffices to justify FDA's decision. *Id.* § 381(a). Moreover, FDA considered that MediNatura's drugs are especially concerning from a public health perspective because, as injectable drugs, they are delivered directly into the body, sometimes directly into the bloodstream, bypassing some of the body's key defenses against toxins and microorganisms that can lead to serious and life-threatening conditions. Ex. U at 2-3 (Warning Letter to MeidNatura). FDA also considered that MediNatura's injectable drugs are labeled to contain potentially toxic or otherwise harmful ingredients. *Id.* FDA's addition of MediNatura's injectable drugs to IA 66-41 was reasonable and reasonably explained. MediNatura's insistence that FDA should first make particularized findings about the safety of its injectable drugs turns the FDCA's drug approval requirement on its head. It is a sponsor's duty to show that new drugs are safe and effective to gain approval, not FDA's duty to prove that drugs are *not* safe. Thus, MediNatura has not shown a likelihood of success on the merits of this claim.

### c.   IA 66-41 Is Not a Legislative Rule and Thus, Did Not Require Notice-and-Comment Rulemaking

MediNatura alleges in Count II that FDA should have followed notice-and-comment rulemaking procedures before adding its injectable drugs to IA 66-41. This claim fails because IA 66-41 is not a legislative rule. Under the APA, the rulemaking requirements of notice and opportunity for comment are only required for a limited subset of agency pronouncements. Rulemaking is required for "legislative" or "substantive" rules, but not for "interpretive rules" or "general statements of policy." 5 U.S.C. § 553(b)(3)(A) & (d). "Agency action that creates new rights or

imposes new obligations on regulated parties or narrowly limits administrative discretion constitute a legislative rule." *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 717 (D.C. Cir. 2015). In contrast, "interpretive rules are those that merely clarify or explain existing laws or regulations." *Nat'l Med. Enters., Inc. v. Shalala*, 43 F.3d 691, 697 (D.C. Cir. 1995). Similarly, a "policy statement announces the agency's tentative intentions for the future." *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 537 (D.C. Cir. 1986) (quoting *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974)). Interpretive rules and policy statements do not require notice-and-comment rulemaking for issuance or withdrawal. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015).

Regardless of whether IA 66-41 is characterized as an interpretive rule, a policy statement, or not a "rule" at all, it is certainly not a *legislative* rule. IA 66-41 does not impose any new obligations or requirements beyond the existing statutory requirements on importers. Importers remain subject to the exact same statutory obligation—that they refrain from importing unapproved new drugs into the United States. And FDA continues to have the same authority—to refuse admission of products that "appear" to be unapproved new drugs or otherwise in violation of the FDCA. 21 U.S.C. § 381(a). As explained, the source of any future enforcement action would be the FDCA, not IA 66-41. *See Nat'l Mining Ass'n*, 758 F.3d at 252 (holding that guidance document was not a legislative rule because it may not be basis for enforcement action).

Moreover, it is clear from the language of IA 66-41 that the alert is nothing more than an expression of a non-binding policy on import compliance activities. It begins by stating that the alert "represents the Agency's current guidance to FDA field personnel regarding the . . . product(s) at issue. It does not create or confer any rights for or on any person, and does not operate to bind FDA or the public." Ex. B (Import Alert). IA 66-41 further provides: "Guidance: Districts may detain without physical examination shipments of the unapproved and/or misbranded drugs listed

34

in the attachments to this Import Alert." Ex. B at 3 (IA 66-41). The use of the words "Guidance" and "may" clearly demonstrates that the document is not intended to be a binding directive. *See Cathedral Bluffs Shale Oil Co.*, 796 F.2d at 537-38 (the agency's characterization of the pronouncement, and the language of the statement itself, such as the choice between the words "may" and "will," are significant in determining whether the pronouncement is a substantive rule). Rather, IA 66-41 is informational: it allows FDA to efficiently and effectively disseminate information throughout the field and coordinate FDA's screening efforts. Ex. A at 77 (RPM § 9-15). FDA explicitly retains the discretion to assess each entry individually and the flexibility to further develop its policies as the circumstances evolve. IA 66-41 is not a blanket command to field offices to detain.

Furthermore, even if it were a blanket command to detain listed products, IA 66-41 does not create new rights or impose new obligations on parties. As discussed *supra* at 5-7, the decision to detain is only an interim step with "tentative" effect towards the ultimate determination of whether to refuse admission of a drug. *See Pac. Gas & Elec.*, 506 F.2d at 38-39; *Professionals and Patients for Customized Care v. Shalala*, 56 F.3d 592, 596 (5th Cir. 1995). If a product is detained based on the information in IA 66-41, the importer has the opportunity to overcome any presumption of the appearance of a violation by submitting evidence and arguments for FDA's assessment. *See supra* at 5-7. And if FDA ultimately decides to refuse admission, the decision can be appealed administratively within the agency. *See* 21 C.F.R. §§ 10.33, 10.75; Ex. A at 53-57 (RPM § 9-10). Courts have found that, where a pronouncement sets forth a rebuttable presumption that may be challenged in individual proceedings, as IA 66-41 does here, it is not a binding rule. *Panhandle Producers & Royalty Owners Ass'n v. Econ. Regulatory Admin.*, 847 F.2d 1168, 1174-75 (5th Cir. 1988); *Ryder Truck Lines, Inc. v. United States*, 716 F.2d 1369, 1377-78 (11th Cir. 1983).

IA 66-41 is distinguishable from the FDA import alert challenged in *Bellarno Int'l Ltd. v. Food & Drug Admin.*, 678 F. Supp. 410 (E.D.N.Y. 1988), which was held to be a binding legislative rule

subject to notice-and-comment rulemaking. The import alert in *Bellarno* used the words "automatically" and "shall," *id.* at 415, leading the court to find that it was binding on both the agency and importers. *Id.* at 414. The court also cited a contemporaneous memorandum issued by the agency that provided that "[t]here should be no exceptions to strict enforcement." *Id.* at 415. Here, by contrast, IA 66-41 employs discretionary, non-mandatory language, providing that "[d]istricts *may* detain" products listed on the alert. The import alert in *Bellarno* also contained requirements for overcoming detention that went beyond satisfaction of the statutory standard, such as establishing a "complete chain of custody" and a "satisfactory reason for return of the goods." *Id.* at 411-12. The *Bellarno* court thus found that the agency had created a new obligation (*i.e.*, acquiring and maintaining a paper chain of custody) with which importers had to comply to satisfy the statutory requirements. *Id.* at 414 & n.4. IA 66-41, by contrast, imposes no obligation beyond that which the statute already imposes on the importer—to refrain from importing unapproved new drugs. Thus, *Bellarno* is inapposite.

### d. FDA Did Not Act Arbitrarily and Capriciously by Failing to Establish a Separate NDA Process or a New GRAS/E Standard for Homeopathic Drugs

MediNatura alleges in Count IV that "FDA has arbitrarily failed to either consider whether homeopathic drugs are [GRAS/E] or create an appropriate NDA process for homeopathic drugs." Dkt. 1 at 24 (Compl. ¶ 96). As discussed earlier, *see supra* at 25-26, MediNatura lacks standing for this claim. But even if the Court reaches the merits, MediNatura has not shown a likelihood of success. MediNatura complains that FDA has failed to establish an independent NDA process or a new GRAS/E standard for homeopathic drugs. But these changes can only be made by Congress. Neither FDA nor this Court has the power to amend the statute. FDA cannot act arbitrarily and capriciously by failing to do something the FDCA does not authorize it to do.

MediNatura complains that the FDCA's requirements are expensive, and that homeopathy is so unique that the statute's requirements are "poorly suited" for homeopathic drugs. But the FDCA does not provide that homeopathic drug sponsors should be given special financial or scientific treatment. That FDA referred to the homeopathic industry many years ago as "unique[]," Dkt. 5-1 at 44 (Pl. Mem.), is irrelevant. Homeopathic drugs are subject to the rigorous, evidence-based principles prescribed by the FDCA for the scientific evaluation and regulation of all drugs.

MediNatura also suggests FDA could consider a homeopathic drug's long history of use as "prima facie case that it is [GRAS/E]." Dkt. 5-1 at 45 (Pl. Mem.). But FDA is prevented from doing so by operation of the statute and case law interpreting it. *See* 21 U.S.C. § 321(p); *Weinberger v. Bentex Pharms., Inc.*, 412 U.S. 645, 652-54 (1973) (establishing GRAS/E standard). Accordingly, MediNatura has not shown a likelihood of success on the merits of Count IV.

> **e.     To the Extent MediNatura's Complaint Could Be Interpreted to Allege that FDA Acted Arbitrarily and Capriciously by Not Determining that Its Injectable Drugs Are GRAS/E, Such a Claim Is Not Likely to Succeed**

As discussed earlier, *supra* at 26, footnote 12, MediNatura does not allege that FDA acted arbitrarily and capriciously by not determining that its injectable drugs are GRAS/E. But if MediNatura's Count III is construed as such a claim, MediNatura failed to establish that it is likely to succeed on the merits because MediNatura does not even attempt to show that its injectable drugs meet the GRAS/E standard. A drug qualifies as GRAS/E if it: (1) has been subjected to adequate and well-controlled clinical investigations establishing that it is safe and effective; (2) the investigations have been published in the scientific literature; and (3) experts generally agree, based on those published studies, that the drug is safe and effective for its intended uses. *See Bentex Pharms., Inc.*, 412 at 652-53; *Premo Pharm. Labs., Inc. v. United States*, 629 F.2d 795, 802-04 (2d Cir. 1980). A drug's general recognition as safe and effective must be evidenced by at least the same

quality and quantity of data as are necessary to support approval of an NDA. *See Hynson, Westcott & Dunning*, 412 U.S. at 629-30. *See also* 21 C.F.R. § 314.200(e)(1). Based on the record, MediNatura's injectable drugs do not come close to satisfying these criteria.

MediNatura has not alleged that investigations of its six injectable drugs have been published in the scientific literature or that experts generally agree, based on those published studies, that the products are safe and effective for their intended uses. To the contrary, most of the information MediNatura provides regarding investigations of its drugs, Dkt. 7 (Pl. Exs. O-U, Y), are not only unpublished, but are also under seal with this Court so as to protect them from public disclosure. These unpublished and nonpublic materials obviously cannot form the basis of a GRAS/E determination. *See Bentex Pharms., Inc.,* 412 U.S. at 652. MediNatura offers one published study, Dkt. 5-2 at 568-610 (Pl. Ex. W at 33-42 (MOZArT Trial)), relating to two of the six drugs at issue, Traumeel and Zeel. Even if the study were adequate and well-controlled, and even if it provided some evidence of the two drugs' effectiveness (points FDA does not concede), it fails to establish a consensus within the scientific community that the drugs are safe and effective. And to the extent MediNatura purports to rely on anecdotal data, such as the clinical experience of practicing physicians or a drug's long history of use, it is well-established that such data cannot establish that a drug is GRAS/E. *See Hynson, Westcott & Dunning*, 412 U.S. at 619.

Moreover, the information that MediNatura provides about active ingredients, *see* Dkt. 5-2 at 569-575 (Pl. Ex. W at 9-32 (Materia Medica/Kent's Repertory Excerpts)), does not support an argument that its drugs are GRAS/E. The word "drug" in the "new drug" definition refers to the entire finished product, not just the active ingredients. *United States v. Generix Drug Corp.*, 460 U.S. 453, 461 (1983). Thus, courts generally have not been receptive to reliance on studies of one drug to support a claim that a similar or "identical" drug is GRAS/E. *See United States v. 225 Cartons, More or Less of an Article or Drug*, 871 F.2d 409, 417-418 (3d Cir. 1989); *United States v. Atropine Sulfate 1.0 mg*

*(Article of Drug) Dey Dose*, 843 F.2d 860, 862-63 (5th Cir. 1988). MediNatura's reliance on the fact that its injectable drugs' ingredients are listed in the Homoeopathic Pharmacopoeia of the United States (HPUS) is similarly unavailing. The existence of a drug monograph in an official compendium such as the HPUS does not reflect that the compendium made any safety or efficacy determination under the FDCA. Nor is the HPUS authorized to make such a determination. FDA does not control which monographs the HPUS publishes or maintains, so the existence of a HPUS monograph does not reflect FDA's agreement that the drug described therein is GRAS/E. In short, MediNatura is not likely to succeed in arguing that FDA violated the APA in failing to conclude that its injectable drugs are GRAS/E.

### 2.   MediNatura Has Not Shown Irreparable Harm

In addition to MediNatura's inability to show it will likely succeed on the merits, the Court must deny its request for a preliminary injunction because MediNatura cannot demonstrate that it is likely to suffer irreparable harm. In the D.C. Circuit, the irreparable harm standard is "quite high." *Brown v. District of Columbia*, 888 F. Supp. 2d 28, 31 (D.D.C. 2012). MediNatura "must demonstrate injury that is both certain and great, actual and not theoretical, beyond remediation, and of such imminence that there is a clear and present need for equitable relief." *Soundboard Ass'n v. U.S. Fed. Trade Comm'n*, 254 F. Supp. 3d 7, 13 (D.D.C. 2017). MediNatura's assertions of harm fall far short of this high standard, and for this reason alone, the Court "*must* deny the motion." *Cal. Ass'n of Private Postsecondary Sch.*, 344 F. Supp. 3d at 167 (emphasis added).

MediNatura argues that it will suffer irreparable harm because any economic harm is not recoverable due to FDA's sovereign immunity. But "the fact that economic losses may be unrecoverable does not absolve [MediNatura] from its 'considerable burden' of proving that those losses are 'certain, great and actual.'" *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 52 (D.D.C. 2011) (quoting *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005)). Indeed, "even

where the United States is the defendant, a plaintiff must establish that the economic harm is so severe as to cause extreme hardship to the business." *Cal. Ass'n of Private Postsecondary Sch.*, 344 F. Supp. 3d at 171 (quotations omitted).

MediNatura further alleges that "detaining" its injectable drugs: (1) will "threaten the viability" of MediNatura's business because the drugs represent 40 percent of MediNatura's revenue; (2) will "upset" its contract with its German supplier and U.S. distributors; (3) "could" disrupt its relationship with medical providers; and (4) could "potentially" cause MediNatura to lose customers who purchase its OTC products after using its injectable drugs. Dkt. 5-1 at 48 (Pl. Mem.). But these alleged harms are merely conclusory and speculative and therefore cannot satisfy the high irreparable harm standard. With respect to the viability of its business, MediNatura provides no additional information about its current financial condition and ability to continue operating during the pendency of this litigation if it cannot sell its six injectable drugs. Moreover, MediNatura fails to specify which of its six injectable drugs will run out in August as opposed to October, and the sales volume of these injectable drugs varies significantly. Dkt. 5-2 at 179 (Cliff Clive Aff. ¶ 24), 182-184 (2002-2009 U.S. Sales Summary). Similarly, MediNatura makes no attempt to explain how its contracts would be upset or its relationships with medical providers would be disrupted without a preliminary injunction. Nor does MediNatura provide evidence of how many customers it might lose. In short, MediNatura's conclusory allegations do not suffice. *Cf. Am. Meat Inst. v. U.S. Dep't of Agric.*, 968 F. Supp. 2d 38, 77-78 (D.D.C. 2013), *aff'd*, 746 F.3d 1065 (D.C. Cir. 2014), *reh'g en banc granted, opinion vacated*, 35 ITRD 2763 (D.C. Cir. 2014), and *judgment reinstated*, 760 F.3d 18 (D.C. Cir. 2014) ("bare allegations of what is likely to occur" are not sufficient to support a claim of irreparable injury, "since the court must decide whether the harm will in fact occur"); *Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of Fed. Reserve Syst.*, 773 F. Supp. 2d 151, 181 (D.D.C. 2011) (quoting *Wis.*

*Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)) (explaining that plaintiff must "adequately describe and quantify the level of harm its members face").

Finally, MediNatura argues that it will suffer irreparable harm because FDA's actions "directly conflict" with MediNatura's mission "to bring natural remedies to its customers, reduce the suffering of thousands, and save lives," citing *League of Women Voters of United States v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016). Dkt. 5-1 at 49 (Pl. Mem.). In *League of Women Voters*, the D.C. Circuit recognized that obstacles making it more difficult for the appellants to accomplish their primary mission of registering voters provided the injury, but the harm was irreparable for a different reason: after registration deadlines for the election passed, there would be no do over. *Id.* at 8-9. This is not the situation here. Even assuming FDA's actions directly conflict with MediNatura's mission, MediNatura has failed to show irreparable harm.[15]

### 3.   The Balance of Equities and Public Interest Weigh Against Injunctive Relief

The balance of harms and public interest weigh strongly in FDA's favor. Because the government is the party opposing MediNatura's motion, the balance of equities and the public interest merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). "[T]he government's interest is the public interest." *Soundboard Ass'n*, 254 F. Supp. 3d at 14. Here, the balance of equities weighs against a preliminary injunction.

FDA withdrew the CPG and added MediNatura's injectable drugs to IA 66-41 as part of its effort to adjust enforcement priorities with respect to unapproved homeopathic drugs. These efforts arose from the growth of the homeopathic drug industry and increased safety concerns. FDA is also

---

[15] MediNatura's allegation that it will suffer irreparable harm if this Court does not vacate the withdrawal of the CPG strains credulity because the CPG was withdrawn in October 2019, and MediNatura filed this Complaint months later, on July 29, 2020.

concerned that injectable drugs can pose risks of serious harms to users because they are delivered directly into the body and bypass some of the body's key defenses against toxins and microorganisms, which can lead to serious and life-threatening conditions. Ex. U at 2-3 (Warning Letter to MediNatura). FDA's adjustment of enforcement priorities with respect to unapproved homeopathic drugs, and MediNatura's injectable drugs in particular, is in the public's interest.

Enjoining FDA from using IA 66-41 to address shipments of MediNatura's injectable drugs would conflict with the public's interest in FDA's efficient enforcement of the FDCA. As explained, *see supra* at 5-7, import alerts allow FDA to efficiently and effectively disseminate information throughout the field and coordinate FDA's screening efforts. They help FDA address the disparity between the massive volume of imported products and FDA's limited resources. Enjoining inclusion of MediNatura's injectable drugs on IA 66-41 would prevent FDA from being able to efficiently address them. Additionally, reinstating the CPG would create confusion because it no longer represents FDA's enforcement priorities for homeopathic drugs and it would coexist with the Draft Guidance—precisely the situation FDA sought to avoid when it withdrew the CPG. *See supra* at 11.

MediNatura's arguments to the contrary should be rejected. MediNatura incorrectly states that withdrawing the CPG "removes a set of labeling and other requirements that helped to ensure the safe and accurate marketing of homeopathic products." Dkt. 5-1 at 50 (Pl. Mem.). The CPG did not establish "requirements." Rather, it set out how the agency expected to view the statutory requirements and those requirements are unchanged.

MediNatura also argues that, if its injectable drugs become unavailable, the public will likely turn to "riskier" options, such as injectable corticosteroids or compounded homeopathic drugs. Dkt. 5-1 at 49-50 (Pl. Mem.). It is patently unreasonable to suggest that removal of *illegally*-distributed unapproved drugs from the market will *harm* public health by driving people to *lawfully* distributed

alternatives. MediNatura's attempt to raise the spectre of homeopathic compounding under poor production conditions is also unavailing. When drugs are compounded, the agency enforces applicable production standards under 21 U.S.C. § 351.

The balance of harms and public interest weigh strongly in FDA's favor. In sum, MediNatura fails to carry its burden on each element of the preliminary injunction standard. Its motion should be denied.

## V.    CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motion to Dismiss and deny MediNatura's Motion for Preliminary Injunction.

Dated: August 17, 2020

Of Counsel:

ROBERT P. CHARROW
General Counsel

STACY CLINE AMIN
Chief Counsel
Food and Drug Administration
Deputy General Counsel
United States Department of Health and
Human Services

ANNAMARIE KEMPIC
Deputy Chief Counsel for Litigation

JULIE B. LOVAS
Senior Counsel
Office of the Chief Counsel
Food and Drug Administration
10903 New Hampshire Avenue
Bldg. 31, Room 4520
Silver Spring, MD 20993-0002
(301) 796-8575

Respectfully submitted,

ETHAN P. DAVIS
Acting Assistant Attorney General
Civil Division

DANIEL J. FEITH
Deputy Assistant Attorney General

GUSTAV W. EYLER
Director

HILARY K. PERKINS
Assistant Director

 /s/ Kathleen B. Gilchrist
KATHLEEN B. GILCHRIST (D.C. Bar
No. 230445)
Trial Attorney
United States Department of Justice
Civil Division
450 5th Street, NW
Washington, DC 20001
Tel: (202) 305-0489
Email: Kathleen.B.Gilchrist@usdoj.gov

*Counsel for Defendants*

## **<u>CERTIFICATE OF FILING AND SERVICE</u>**

I hereby certify that on August 17, 2020, I electronically filed the foregoing document

with the Clerk of the United States Court for the District of Columbia using CM/ECF.


Dated:  August 17, 2020                               /s/ Kathleen B. Gilchrist
                                                      KATHLEEN B. GILCHRIST